121 N.J. Super. 228 (1972)
296 A.2d 545
BOISE CASCADE HOME & LAND CORPORATION, A DELAWARE CORPORATION, PLAINTIFF,
v.
DIVISION OF THE NEW JERSEY REAL ESTATE COMMISSION IN THE DEPARTMENT OF INSURANCE, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided November 3, 1972.
*230 Mr. John W. Bissell for plaintiff (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Steven R. Bolson, Deputy Attorney General, for defendant (Mr. George F. Kugler, Jr., Attorney General, attorney).
SEIDMAN, J.S.C.
On stipulated facts, each side moves for summary judgment.
Plaintiff Boise Cascade Home & Land Corporation filed a complaint for a declaratory judgment that certain telephone operations conducted by its employees do not violate the New Jersey Real Estate License Act, N.J.S.A. 45:15-1 et seq., and that the telephone operators need not be licensed either as real estate salesmen or brokers. The complaint also seeks to enjoin defendant Real Estate Commission from interfering with the telephone procedures and from resorting to sanctions against plaintiff.
The narrow issue to be resolved is whether persons hired by the corporate owner of building lots to solicit prospective purchasers by telephone, are engaged in the real estate business so as to require their being licensed.

*231 I
The stipulated facts are these:
Boise Cascade Home & Land Corporaton (Boise Cascade), the owner and operator of a large recreation community in the Poconos known as The Hideout, is in the process of constructing recreation facilities and selling to the public over 2400 vacant lots as recreation and vacation home sites.
In November 1970 two licensed New Jersey real estate brokers received permission from the New Jersey Real Estate Commission (Commission), pursuant to N.J.S.A. 45:15-16.1, to engage in promotional sales of Hideout lots in New Jersey; and, since that date, such promotional sales activity has taken place in New Jersey under the supervision of the brokers. Boise Cascade has an office in Clifton, Passaic County, out of which operates a team of about 25 licensed real estate salesmen, employed by and under the supervision of one of the brokers. Clerical personnel and persons other than the salesmen are employees of Boise Cascade.
As a followup to its media advertising, Boise Cascade employs at the Clifton office 15 or 20 persons, mostly girls, whose function it is to make telephone calls to New Jersey residents. A prepared script is recited, reading as follows:
 Good (morning-afternoon)
Mr.-Mrs. ____. This is ____ calling for the Hideout. Are you familiar with the Hideout? It's Boise Cascade Corporation's newest year-round recreational community located in the Poconos of Pennsylvania. We are calling to acquaint residents of ____ (area) ____ with it.
We will have licensed representatives in your area and if you are interested, one could stop by for 10-15 minutes to tell you more about it. You are under no obligation  again we are just acquainting families with what Boise Cascade Corp. has done.
Would ____ (night) ____ be convenient between ____ (time) ____ and ____ (time) ____ for you and your (husband-wife)? It's only for 10-15 minutes.
If the person called shows interest, an appointment is made for a visit by a licensed representative; otherwise, the *232 call is terminated. In the exceptional situation where a person, though interested, does not desire to make an appointment, follow-up calls are made by a licensed salesman or broker.
The telephone girls are paid by Boise Cascade at an hourly rate without regard to the number of calls made, the number of appointments made, or the number of sales ultimately consummated. The licensed New Jersey real estate representatives are paid through their employing broker on a straight commission basis on sales actually consummated, as are the Pennsylvania salesmen who show and actually sell the lots.
After an investigation of the telephone procedure with the cooperation of Boise Cascade and its broker, and after an informal conference with Boise Cascade's representatives, the Commission advised that it considered the use of unlicensed individuals making the telephone calls to be a violation of N.J.S.A. 45:15-1, 2 and 3, and that Boise Cascade, its broker and the telephone girls would be subject to the penal and administrative sanctions of N.J.S.A. 45:15-17, 18, 23 and 24 in the event the practice continued. As a result Boise Cascade halted the use of its telephone procedures in New Jersey, rather than risk prosecution.
If required to comply with the position taken by the Commission, Boise Cascade must either discontinue permanently its telephone procedures and have only licensed real estate salesmen employed by the broker perform this function, or bear the expense of financing the required schooling and licensing of its telephone operator employees.

II
The court was of the view that the stipulated facts did not sufficiently detail the operations at plaintiff's Clifton office. Unanswered were such questions as: Who operated that office? Who hired and instructed the girls? Under whose supervision did they function? What relationship was *233 there between plaintiff, the telephone girls, the salesmen and the brokers? At the court's request, plaintiff sought to answer these questions by producing as a witness William J. Murphy, III, its regional manager, or coordinator of sales activities, for New Jersey. There is no reason to doubt his testimony.
Murphy explained that Boise Cascade rents office space in Clifton, and that a real estate broker maintains a sub-office on the premises. All the operating expenses, includ-rent, electricity and telephone are paid by Boise Cascade. The telephone room manager is responsible for hiring and training the telephone girls, who perform their functions under the scrutiny of a supervisor.
A telephone girl's employment, on an average, lasts about a month. The job, a routine one, requires the repetitive reading of a script during a four-hour shift. Calls are made from lists of names drawn mainly from city directories. If the person called is responsive, the name, address and telephone number are written down and the memorandum turned in to the supervisor who then hands it for checking to one of the telephone girls designated as a "confirmer," following which the lead is referred to a licensed salesman, who contacts the prospect.
Murphy further stated that if, after listening to the reading of the script, the person called requests further information, it is the obligation of the telephone girl to stress the fact that a representative would be in the area to explain the project in more detail. If there is a lack of interest, the telephone girl is expected to say something like, "This is why our licensed representative is going to be there in the area, to find out if you are interested."
Telephone girls are fired if they do not produce an average of three or four appointments in a four-hour shift. One of the requirements of the job is a pleasant friendly voice. To keep up their interest a bell is rung by the supervisor whenever an appointment is made.
*234 The broker, according to Murphy, is not involved in the actual sale of lots. His function is mainly to make sure that the salesmen are properly licensed.

III
The Commission contends that the telephone girls employed by Boise Cascade are engaged in the real estate business within the meaning of N.J.S.A. 45:15-1 et seq., and, therefore, must be licensed as required by the statute. Boise Cascade, on the other hand, argues that the statute does not apply to the kind of activity described in the stipulated facts, and that the telephone girls do not have to be licensed. A resolution of the issue obviously requires an analysis of the pertinent statutory provisions.
N.J.S.A. 45:15-1 states that no person shall engage either directly or indirectly in the business of real estate broker or salesman, temporarily or otherwise, and no person shall advertise or represent himself as being authorized to act as a real estate broker or salesman, or to engage in any activities described in N.J.S.A. 45:15-3, without being licensed to do so as provided in the statute. According to section 2 of the statute, any single act, transaction or sale constitutes engaging in business within the meaning of the statute.
The definition of a real estate broker, contained in section 3, is broad. In pertinent part, it includes anyone "who, for a fee, commission, or other valuable consideration * * * solicits for prospective purchasers or assists or directs in the procuring of prospects * * *". A real estate salesman includes any person employed by and operating under the supervision of a licensed real estate broker, whose function, among other things, is "to solicit for prospective purchasers or lessees of real estate," or "to sell or offer to sell lots or other parcels of real estate."
There is no doubt that the telephone girls are hired and paid by Boise Cascade to solicit for prospective purchasers *235 or to assist in the procuring of prospects. To this extent, what they do fits within the definition of a real estate broker. Boise Cascade, however, points to that portion of section 4 which provides, in substance, that the statute does not apply to any person, firm, partnership, association or corporation "who, as a bona fide owner or lessor, shall perform any of the aforesaid acts with reference to property owned by him." The argument is made that since a corporate landowner can act only through its agents or employees, those who are engaged in the defined activities are, like their principal or employer, also excepted from the statute.
In claiming such exemption Boise Cascade recognizes that it must first overcome the obstacle which appears in section 3, the pertinent segment of which is as follows:
In the sale of lots pursuant to the provisions of this article, the term "real estate broker" shall also include any person, partnership, association or corporation employed by or on behalf of the owner or owners of lots or other parcels of real estate, at a stated salary, or upon a commission, or upon a salary and commission, or otherwise, to sell such real estate, or any parts thereof, in lots or other parcels, and who shall sell or exchange, or offer or attempt or agree to negotiate the sale or exchange, of any such lot or parcel of real estate.
In other words, although section 4 excepts from the statute a bona fide owner who performs any of the acts which otherwise would require licensing, and, it is argued, corporate employees performing these acts are likewise exempt, the exception does not apply, in the case of the sale of lots, to persons employed by the owner to sell such lots, and who sell or exchange them, or offer or attempt or agree to negotiate for their sale.
In contending that employees of corporate owners of real estate, other than in the case of the sale of lots, are exempted from the statute, Boise Cascade cites Palkoski v. Garcia, 32 N.J. Super. 343 (App. Div. 1954), aff'd 19 N.J. 175 (1955), which suggests that since a corporation acts only through its agents and servants, where a corporate owner of real estate is excluded from the statutory license requirement, *236 its employee, performing the same function, is also within the exclusion. The Commission claims that this portion of Palkoski is dictum and that to apply it to the present case would defeat the purpose of the statute.
The Commission relies heavily upon Alligood v. Florida Real Estate Commission, 156 So.2d 705 (Fla. App. 1963), which involved the interpretation and application of a section of the Real Estate License Law of Florida. It is the only reported case brought to the court's attention which is factually similar to the one at bar.
In that case, the plaintiff instituted a suit for declaratory decree against the commission claiming that her activities as a telephone solicitor did not come within the section of the law requiring certain services rendered in connection with the purchase and sale of real estate to be performed only by a registered broker or salesman. The plaintiff, who was employed by Gulf American Land Corporation, the owner and subdivider of land in Florida, to call persons by telephone and invite them to visit her employer's project, did not quote prices or terms and gave no pertinent details relative to the land being offered for sale. After giving the name and address of an interested prospect to a supervisor, she had no further contact with such person. Her compensation was at the rate of $1.15 per hour, plus $3 for every person whom she successfully solicited to visit the area.
On these facts, the Florida court held that plaintiff came within that section of the statute which declared that every person who, for compensation or valuable consideration, took part in the procurement of purchasers of real property, or who directed or assisted in the procuring of prospects, was a real estate broker or a real estate salesman who had to be registered or licensed as such. The court said:
It was the intent of these statutes to define and regulate the real estate brokerage and sales profession. It appears that the legislature intended to encompass a variety of services, which if performed in this state, for another, for compensation, would require licensing. One of such services is the obtaining of prospects for the purchase of real estate.
*237 The purpose of this legislation is to protect the public from being subjected to real estate sales programs by persons not licensed by the commission and therefore perhaps not qualified to perform such services. Perhaps, too, persons not licensed by the commission would not be well versed in the high ethical standards of conduct which the profession, with the aid of the Florida Real Estate Commission, is striving to accomplish.
By virtue of this statute, a person performing particular acts either is, or is not, operating as a real estate broker or salesman and hence subject to the requirement of licensing as such. General statements, or so called "definitions" of real estate brokers or salesmen, or of services generally performed by them have no material degree of control upon the determination of whether or not a person is operating as a broker or salesman. The language of this statute is the controlling and final definition of a real estate broker, or salesman, in this state.
The legislature has seen fit to provide that one who directs or assists in the procuring of prospects for the purchase of real estate shall be registered, or licensed, as a real estate salesman, or broker.
The language which is pertinent to this case is admittedly broad, but it is equally clear and unambiguous. No resort need be made to the general rules of judicial interpretation to understand it. It is plain and simple English and it is the duty of the courts to apply the literal meaning of the language. See 50 Am. Jur., 236, Statutes, Section 241. Also 30 Fla. Jur. 174, Statutes, Section 74. See especially Van Pelt v. Hilliard, 75 Fla. 792, 78 So. 693, L.R.A. 1918E, 639. The problem at hand is, therefore, not to determine the meaning of the statute or interpret it, but to determine whether the appellant was assisting in the procuring of prospects for the purchase of real property.
It appears that each of the essential elements of the statute were involved in the appellant's employment and the pursuit of her duties in such employment.
The "bonus" of $3.00 for each prospect the plaintiff produced is a material factor in this determination. This element takes the job out of the classification of simple clerical employment and indicates the importance of the salesmanship element. True, she makes no direct effort at sales but like the circus "drummer" she gets them in the tent for the show.
The ultimate consideration is that these prospects who are the object of extensive exposure to the sales program at some considerable expense are those determined by the efforts of the plaintiff to be at least interested in the project. She certainly is taking part in the procuring of prospective customers. The specific activities of the appellant constituted the first and very important step in a field of endeavor which lends itself logically to the safeguards of the regulatory measures of the Florida Real Estate Commission. Foulk v. Fla. Real Estate Commission (1959 Fla. App.) 113 So.2d 714; Section 475.01(2), Fla. Statutes, 1961, F.S.A.; 5 Fla. Jur. Brokers, Section 5, Page 26.
*238 Boise Cascade seeks to distinguish Alligood on both the facts and the law. There are, it is true, differences between the procedures utilized by the telephone solicitor in Alligood and those in the present case. In fact, it seems as though Boise Cascade was aware of Alligood and endeavored studiously to overcome some of the objectionable features thereon. The employee in that case received a commission for each appointment she arranged, a factor the Florida court considered material in its determination. However, the absence of commissions in this case ought not necessarily to lead to a contrary conclusion. Boise Cascade's telephone girls do more than only simply clerical tasks. They do not, as Boise Cascade contends, perform the same ministerial function as a secretary who types letters and makes appointments.
It is evident that the telephone girls here play a significant part in the development of plaintiff's sales program. They are the first to make direct contact with members of the public. They are chosen not simply to recite a prepared script, but rather to attract attention by the manner in which the message is projected. Murphy candidly stated that a girl can get appointments if she has a pleasant voice and sounds friendly. The incentive, to her, is not a bonus or commission; it is the threat of losing her job, and the ringing of a bell to signal each appointment is intended to spur on the telephone girls to greater efforts. As was said so well in Alligood, the telephone girl, like the circus drummer, "gets them in the tent for the show." There is no doubt that these employees, to use the language of our statute, solicit for prospective purchasers or assist in the procuring of prospects. Factually, therefore, Alligood is not dissimilar from the one now before the court.
Alligood is distinguishable in another respect. It was noted earlier herein, that N.J.S.A. 45:15-4 excludes from the operation of the statute a bona fide owner of land who performs acts which, if done by another, would require a license. This exclusion, it is argued, applies as well to corporate *239 agents or employees doing those acts. However, in the sale of lots the term real estate broker includes anyone employed by the owner thereof, at a salary or commission or otherwise, to sell such real estate, and who shall sell or exchange, or offer or attempt or agree to negotiate the sale of any such lot. N.J.S.A. 45:15-3. The Florida real estate license law, F.S.A. § 475.01 et seq., has no comparable provisions. It contains a very limited exclusion of owners or employees of corporate owners. As that statute is worded, the term "broker" or "salesman" does not apply to a person who deals with property of which he is a part owner (except as otherwise provided therein), or to the president or other designated officer of a corporation engaged in the sale of its own properties. Consequently, the fact that the plaintiff in Alligood was an employee of the corporate owner of the land is of no significance, since there was no statutory exception applicable to her.

IV
The problem before the court, in the present case, is not so much the scope of Palkoski v. Garcia, supra, which in any event ought not to be extended beyond the issues involved therein. It is whether the telephone girls are, in fact, employed on behalf of Boise Cascade, at a stated salary, to sell lots and whether they "sell or exchange, or offer or attempt or agree to negotiate the sale or exchange, of any such lot or parcel of real estate." This is the crucial issue, for if the employees do not get within that category they are not subject to the licensing requirements of the statute in question.
Boise Cascade contends that the Legislature did not intend to prohibit all real estate activities by employees of corporate owners, but merely to regulate those aspects constituting actual sales. An attempt is made to distinguish the selling of real estate from the solicitation of prospective purchasers. This concept of the statute, in the view of the court, is too narrow.
*240 The licensing act is a regulatory measure which represents the strong public policy of this State. Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63, 71 (1959); State v. Stockl, 85 N.J. Super. 591, 597 (Cty. Ct. 1964). It is designed to protect the public from fraud, incompetence, misinterpretation and sharp or unconscionable practice. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553 (1967). A commission has been created to the end that in the interest of the public welfare, incompetent, unworthy and unscrupulous persons would be excluded from the real estate brokerage business. Division of N.J. Real Estate Comm'n v. Ponsi, 39 N.J. Super. 526, 532-533 (App. Div. 1956); Handelsman v. Div. of N.J. Real Estate Comm'n, 101 N.J. Super. 244, 248 (App. Div. 1968).
The type of venture involved in this case, the promotional sales of property located outside the State, has received especial legislative attention. See N.J.S.A. 45:15-16.1 et seq., requiring particulars of such promotional sales to be filed with the Commission, the purpose of which is to prevent fraud and deception of the public in real estate transactions. Such statutes, enacted here and elsewhere, reflect the widespread concern that promotional sales be free of unethical or fraudulent practices. See Gaitanis, "Recent Florida and Federal Laws Regulating Promotional Land Sales," 43 Fla. Bar J. 90 (1960); Walsh, "Consumer Protection in Land Development Sales," 44 Conn. Bar J. 403 (1970).
Remedial statutes are to be given a liberal interpretation, 3 Sutherland, Statutory Construction (3d ed. 1943), § 5701; 50 Am. Jur., Statutes, § 392; 82 C.J.S. Statutes § 388. See State v. Meinken, 10 N.J. 348, 352 (1952); Carianni v. Schwenker, 38 N.J. Super. 350, 361 (App. Div. 1955); Newark v. Dept. of Health of N.J., 109 N.J. Super. 166, 177 (App. Div. 1970); Ricci v. Ricci, 96 N.J. Super. 214, 227 (Cty. Ct. 1967).
Boise Cascade's contention that the language of N.J.S.A. 45:15-3, insofar as it relates to the sale of lots by an *241 employee of the owner, does not prohibit all real estate activities by such employees but merely regulates those aspects constituting actual sales, is unsound, as is the further argument that the term "to sell," as used in the statute, refers only to acts effecting a transfer of realty and not to such pre-sale activities as the solicitation of prospective customers. To circumscribe the terms in such fashion would negate the purpose of the act and frustrate the public policy of the State. The process of selling real estate cannot be fragmented into solicitation, negotiation and consummation, with only the latter phase encompassed within the term "to sell." It has been held that the words "sell" and "sale," as applied to the relation between the owner of land and a real estate broker working to secure a purchaser of the land, import no more than the act of bringing the owner and purchaser together on terms satisfactory to both, or procuring a purchaser able, ready and willing to buy on the terms fixed by the seller. Resky v. Meyer, 98 N.J.L. 168, 171-172 (E. & A. 1922). In agreements between the owners of land and real estate brokers, the words mean negotiating a sale by finding a purchaser on satisfactory terms. Lindley v. Keim, 54 N.J. Eq. 418, 423 (E. & A. 1896). If, in the case of real estate brokers, the term "to sell" means "to negotiate a sale," the question which arises is whether "negotiating" requires the conducting by a broker of all proceedings in a transaction from the initial steps looking to the making of a contract up to and including the ultimate conclusion thereof, or whether it connotes something less than that. This question was considered and answered in Corson v. Keane, 4 N.J. 221, 224-227 (1950). The holding in that case was that one not licensed as a real estate broker, in arranging a meeting for the negotiation of a loan secured by a real estate mortgage, was precluded by the statute from recovering a commission pursuant to an agreement therefore. The court quoted the following excerpt from the case of Baird v. Krancer, 138 Misc. 360, 246 N.Y.S. 85 (Sup. Ct. 1930):
*242 The essential feature of a broker's employment is to bring the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement. They may reach that agreement without his aid or interference. Indeed, in a transaction of any magnitude, the terms would never be settled beforehand or negotiated finally by the broker. * * *
This does not mean that the broker has not negotiated the transaction. * * *
If the statute does not apply to such a situation, then it is a toothless enactment. Every unlicensed broker will make the same argument that the plaintiff here has made, that he did not have to bring the parties to actual agreement upon all the details, that that phase was something for the parties themselves to determine. In short, every unlicensed broker will be enabled to carry on his business just as he did before the statute came into existence, simply by calling himself a finder, an originator, an introducer, instead of a broker. This would be an absurd limitation of the statute and one unfounded in reason or policy. A broker "negotiates" just as much when he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure, as when he himself carries on the discussion and personally induces an agreement to accept a specific provision.
The broad scope of the licensing act is further exemplified by the statement in Tanenbaum v. Sylvan Builders, Inc., supra, 29 N.J. at 71, that any single act in the execution of the authority to serve as broker in connection with the stimulation or consummation of a sale constitutes engaging in business and requires the actor to have a license.
In short, to carry out the implicit purpose of the statute, the term "to sell" must be construed to comprise not only the ultimate transfer of ownership of property, but also any act which, in a significant way, is designed and intended to lead to the consummation of the transaction. This necessarily includes the initial phase of solicitation. Thus, a person employed by the owner of lots, at a stated salary or otherwise, to sell such lots is not one engaged solely to transfer or contract to transfer the realty. In the context of the statute, the term "to sell" should reasonably include any one employed to participate significantly in the selling process, including solicitation or negotiation. As was said *243 earlier herein, the role of the telephone girls is important. The procuring of prospective customers is an essential step in the sales program. The court is convinced that, by a liberal but sensible interpretation of the statute, the telephone girls should be considered employees hired "to sell" lots.
Boise Cascade notes a dichotomy in that portion of N.J.S.A. 45:15-3 which, in the case of the sale of lots, defines "real estate broker" to include any one employed by the owner to sell the lots and who shall sell or exchange, or offer or attempt or agree to negotiate the sale or exchange thereof. The argument is advanced that an employee, to require licensing, must not only be hired to sell lots; he must also sell or negotiate the sale of such lots. The court does not believe that the distinction sought to be made is of consequence. The broad interpretation given to the term "to sell" is equally applicable to the clause "and who shall sell * * * or offer or attempt to agree to negotiate the sale * * * of any such lot." The solicitation by the telephone operators is, in a sense, a preliminary offer or attempt to negotiate a sale, and is, of course, part of the selling process.
It should be emphasized that the statutory concern is not merely to license persons employed for the limited purpose of telephone solicitation. The strong public policy of the State is that the selling of real estate, unless otherwise specified, shall be in the hands of qualified and licensed salesmen and brokers; and the solicitation of prospective purchasers, whether by telephone or in some other manner, being an essential element of the selling process, should be done by those who are licensed to engage in the real estate business. The public should not be subjected to real estate sales programs by unlicensed persons. Alligood v. Florida Real Estate Commission, supra, 156 So. So.2d at 707.
It is the conclusion of the court that the telephone operation conducted by Boise Cascade violates N.J.S.A. *244 45:15-1 et seq., and that the solicitation of prospective purchasers in that fashion cannot be done by unlicensed persons.

V
Boise Cascade argues that the Real Estate License Act, if applied to its telephone operator, would offend the due process and equal protection clauses of the United States and New Jersey Constitutions. The point is without merit. It is the duty of this court so to construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation. State v. Profaci, 56 N.J. 346, 350 (1970). There is no doubt that the statute as it is applied to plaintiff's telephone operators is reasonably related to a valid state interest. The case of United Interchange, Inc., v. Spellacy, 144 Conn. 647, 136 A.2d 801 (Conn. Sup. Ct. Err. 1957), cited by plaintiff, is inapposite.

VI
For the reasons expressed herein, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.