137 N.J. Super. 377 (1975)
349 A.2d 108
GLOBAL AMERICAN INSURANCE MANAGERS, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
PERERA COMPANY, INC., A CORPORATION AND PERERA-DEAK & CO., A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 3, 1975.
*380 Mr. Merritt T. Viscardi for plaintiff (Messrs. Apruzzese & McDermott, attorneys).
Mr. Morris R. Zucker for defendants (Messrs. Zucker, Lowenstein, Gurny, Facher and Zucker, attorneys).
ANTELL, J.S.C.
This is an action brought by a surplus lines insurance agent for declaratory relief. On these cross-motions for summary judgment the principal question presented is whether certain premiums for surplus lines insurance paid by defendant insured to its own broker, but never transmitted to the surplus lines insurer or the surplus lines agent, are to be deemed legally received by the insurer where the actual policy was never delivered to the broker. A further question is whether the circumstances are controlled by the New Jersey Surplus Lines Law or whether agency principles of wider application obtain.
On August 12, 1975 Donnelly Bros., a licensed insurance broker, was adjudged insolvent and the liquidation of its *381 business placed in the hands of a statutory receiver. Around April 1971 defendant, a financial institution, began its relationship with Donnelly, seeking high risk crime insurance. After unsuccessful efforts to obtain coverage with domestic insurers, Donnelly opened negotiations with plaintiff, which placed policies during April 1972 and for the years thereafter with Lloyds of London and Companies (Lloyds). Lloyds is a surplus lines insurer  one not authorized to transact business in New Jersey. Because Donnelly's license did not permit it to deal directly with such a company, it was necessary to employ the office of a licensed surplus lines agent. N.J.S.A. 17:22-6.37.
The issue of payment turns on the broker's apparent authority to receive these on behalf of the insurer, and this depends in part upon whether payments were made by the insured after delivery to the broker of a "contract of insurance," N.J.S.A. 17:22-6.2a, a determination involving the interpretation of myriad facts. We must therefore detail the procedures followed among the parties in placing and paying for insurance over the years, and with the sequence of events during the period April through June 1975.
Applications for coverage were made by Donnelly to plaintiff which either specified the proposed effective date or contained instructions to bind immediately without waiting for a premium quote. Plaintiff mailed these applications to Halford, Shead & Co., Ltd. (Halford), its London correspondent broker, and Halford responded whether it could place the risk and, if so, gave the premium quote. This data was relayed to Donnelly which would then reply that the insurance should be ordered. Plaintiff informed Halford accordingly and requested confirmation of the insurance from that office. Although the confirmation, when received, is referred to in one of the plaintiff's affidavits as a "binder," a document which is evidence of a contract of insurance, 12 Appleman, Insurance Law and Practice, § 7221 at 306-307 (1943); 1 Couch on Insurance 2d, § 14.26 at 605 (1959) the term is not used here in its technical sense of providing merely temporary *382 insurance. What is meant is that the coverage was actually "placed." The written notification of confirmation received from London, according to Mr. Feldmesser, plaintiff's vice-president, was a "placement slip" which gave notice of that fact, and Donnelly was notified of its receipt.
A "debit note" later arrived from Halford containing the policy number assigned to the insurance, the premium, the coverage, and the particular London companies insuring the risk. Using this information, plaintiff prepared its "cover note," certifying to the placement of insurance. This was sent on to Donnelly, together with its bill and certain affidavits which had to be executed under the New Jersey Surplus Lines Law, N.J.S.A. 17:22-6.40 et seq. Donnelly returned the executed affidavits and, except for 1975, the year on which this dispute centers, paid plaintiff's bill within 30 to 60 days.
Policies of insurance were never issued by the insuring companies. The primary evidence of insurance issued by the surplus lines agent, i.e., plaintiff, was the cover note, supported, of course, by the confirmation and the debit note which plaintiff received from London. The cover note was delivered to the insured by Donnelly after payment of premium by the insured.
It is important to note that following notification of confirmation, and before receiving the cover note, Donnelly mailed to defendant under its own letterhead its "binder of insurance." The first of these, in 1972, notified defendant that "Insurance is hereby bound from April 25, 1972 at 12:01 A.M. for days in favor of Perera & Company, Inc.," etc. The second notified that "Insurance is hereby bound from April 25, 1973 at 12:01 A.M. until policy issued days [sic] in favor of:  Perera Company, Inc. et al," etc. The third binder was that "Insurance is hereby bound from April 25, 1974 at 12:01 A.M. for 1 yr in favor of Perera Company, Inc.," etc. The last of these read, "Insurance is hereby bound from April 25, 1975 at 12:01 A.M. for 1 yr. days [sic] in favor of Perera Company, Inc," etc. The *383 binders of 1972 and 1973 contained no reference to premium charges. Those of 1974 and 1975 showed the premium charges for the coverage provided in the upper right hand corner of the paper. Each of the binder forms advised that "Subject to standard policy conditions this binder in Lloyds of London provides insurance of the kind hereinafter described." There then followed a description of the coverage provided. On each of the forms the following printed legend appeared:
Acceptance by the Insured of a policy (or policies) as ordered in place hereof shall render this Binder null and void. This Binder may be cancelled by the Insured by notice to the Company or by the surrender of this Binder. This Binder may be cancelled by the Company by written notice to the Insured stating when such cancellation shall be effective. A premium charge shall be made for the time this Binder is in effect if no policy of insurance in place hereof is issued and accepted by the Insured.
A dispute appears in the affidavits of Doris Smith, the plaintiff's solicitor who handled the account, and Richard Allocca, who worked for Donnelly Bros. It deals with whether issuance of the binders was authorized by plaintiff. Allocca swears that not only were they authorized, but that in issuing them he acted at Smith's instructions. She denies having given either the authority or the instructions. She explains, however:
At most, upon our receipt of the confirmation of binding of requested insurance from London, in informing Mr. Allocca thereof, I might have said the coverage is bound and he could so advise his client, or words to similar effect.
To this she adds:
Actually, on the Perera account the insurance having been already placed with the London Companies, there was no need to issue a "binder," but merely advise of the placement.
Regardless of the fact question as to express authority thus projected, there is no challenge to the fact that copies *384 of the binders of 1974 and 1975 were mailed to plaintiff from Donnelly Bros. with covering letters to Doris Smith respectively dated May 6, 1974 and April 21, 1975. Smith herself says no more about these binders than that she "only received copies thereof on an occasional basis, more frequently in 1975, but rarely before then." As to this she comments:
As far as I was concerned, they were part of Donnelly's private relations with their own customer to confirm the placement of the subject insurance and were merely filed by me as, if and when received, without any comment.
Although the policies became effective on April 25 in each of the years, having been confirmed prior to that date, the cover notes were not issued until June 8 in 1972, August 15 in 1973, May 2 and June 21 in 1974, and June 25 in 1975. In 1975 premium payments were made to Donnelly Bros. by defendant totalling $64,232.00 eight separate payments of varying amounts between April 24 and June 16, 1975. It is therefore clear that all of the payments in question were made before any formal policy was issued by the insurer and before plaintiff's cover note was transmitted to Donnelly Bros. Nothing in the evidence suggests that either the cover notes or copies thereof were at any time forwarded to defendant by plaintiff, nor by any other means was plaintiff's role in these transactions ever brought to the attention of defendant.
Following a brief correspondence plaintiff was notified under date of April 21, 1975 by Halford, its London correspondent, as to the amount of defendant's "renewal premiums" as "provisionally agreed" for the coming year. As noted above, the Donnelly Bros. so-called binder was dispatched the same day to defendant, with copies and a covering letter to plaintiff. By letter of September 19, 1975 from Halford the provisional premium was adjusted, resulting in a final premium for the year $625.00 less than originally calculated.
*385 The amount in controversy is $56,000.48 upon gross premiums of $64,290.38 for the policies effective April 25, 1975. The question we must decide is whether the payment thereof by defendant to Donnelly Bros., under the circumstances presented constitutes payment to the insurer whose interests are in this proceeding represented by plaintiff.
Clearly pertinent to the question is N.J.S.A. 17:22-6.2(a), which provides:
Any insurer which delivers in this State to any insurance broker a contract of insurance (other than a contract of life insurance, or life, accident or health insurance) pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is received by such broker within 90 days after the due date of such premium or installment thereof or after the date of delivery of statement by the insurer of such additional premium.
It is argued by plaintiff that since the policy of insurance was not delivered to the broker prior to the making of payments by the insured, the provisions of this statute do not control and the insurer is not deemed to have authorized the broker to receive payment on its behalf.
The enactment is a codification of the common law principle, accepted in New Jersey, that where the broker has been entrusted to deliver the policy, the insured may justifiably believe that his broker is authorized to receive payment of premium therefor on the insurer's behalf. The rule is rooted in considerations of apparent authority. Spilka v. South America Managers, Inc., 54 N.J. 452, 463-464 (1969). But the full reach of the policy formulation which is here applicable is broader than the limits strictly defined by the statutory language. As the court noted in Mt. Vernon Fire Ins. Co. v. Gillian, 95 N.J. Super. 279, 283 (App. Div. 1967), the rule recited "is in accord with general principles of apparent and implied agency long recognized *386 in New Jersey * * *" The general rule is that while an insurance broker acts for the insured in making the application and procuring the policy, he acts for the insurer in delivering the policy and in collecting and remitting the premium. Spilka v. South America Managers, Inc., supra, 54 N.J. at 463; 14 Appleman, Insurance Law and Practice, § 7985 at 236 (1944); 3 Couch on Insurance 2d, § 25.93 25.95 at 404-411 (1960). As the court said in Mesce v. Automobile Ass'n. of New Jersey, 8 N.J. Super. 130 (App. Div. 1950):
The factual question is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question. [at 135]
The statute was fashioned to protect the insurance-buying public under specified circumstances, Kubeck v. Concord Ins. Co., 103 N.J. Super. 525, 533 (Ch. Div. 1968), aff'd 107 N.J. Super. 510 (App. Div. 1969). Since it is remedial in nature it should be so construed as to suppress the mischief and advance the remedy. Newark v. Fischer, 8 N.J. 191, 200 (1951). Remedial statutes are to be given a liberal interpretation. Boise Cascade Home v. N.J. Real Estate Div., 121 N.J. Super. 228, 240 (Ch. Div. 1972). They should be construed to give the words used the most extensive meaning to which they are reasonably susceptible. Wasserman v. Tannenbaum, 23 N.J. Super. 599, 610 (Law Div. 1952).
The fact that the Legislature has acted to provide a remedy does not mean that the judicial branch is limited to the boundary lines of strict legislative expression in fashioning or denying remedies in a particular case. [State v. Carter, 64 N.J. 382, 392 (1974)] It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms." [New *387 Capitol Bar & Grill Corp. v. Div. of Employment Secur., 25 N.J. 155, 160 (1957)]
Before continuing, it is desirable to clarify the dual character of the "delivery" concept which is here involved. There is, first, the aspect of delivery from insurer to broker, expressly dealt with by § 6.2(a), whereby the broker becomes "authorized" to receive payment of premium on the insurer's behalf. The statute itself goes no further than to create the authority. Since the statute codifies the common law, and since the common law doctrine rests on the assumption that the premium is paid by the insured in reliance upon evidence of the broker's apparent authority, the requirement remains viable that there be a further delivery of the contract of insurance from broker to insured before payment of premium. The latter step remains necessary before the insured becomes entitled to a credit for the payment from the insurer, even though this is not expressly recited as a condition by the statute.
While the integrated concept of delivery is of tidier application where the contract of insurance is symbolized by the physical policy, the fact remains that the agency created by the statute is posited, not upon the delivery of a "policy," but of a "contract of insurance," a term of wider and more fluid meaning. That this reading coincides with the manner in which the parties intended their dealings to be conducted is seen from the fact that at no time during the years 1972, 1973 and 1974, when insurance coverage was concededly in force, had a policy ever been issued. Thus, if we were to acquiesce in plaintiff's construction of the statute as requiring that a policy be delivered, the insured could never be entitled to credit for untransmitted payments made to the broker. During these years the only evidence of a contract of insurance which came into existence before the insured made its premium payment was the notification of coverage which was delivered by plaintiff to Donnelly and then transmitted by Donnelly to the insured in the form of "binders."
*388 Whatever may have been the intent and effect of the 1972 and 1973 binders, those of 1974 and 1975 constituted notice that one year's coverage had been placed with Lloyds, of its terms, and the premiums to be paid therefor. They were not binders in the narrow legal sense, but formal notifications from the broker, based solely upon advice furnished by plaintiff, that contracts of insurance had come into existence. Whether the payments thereafter made to the broker in 1975 are deemed received by the insurer is a question which must be studied with particular regard to the fact that copies of the binders were simultaneously sent to the insurer's surplus lines agent and the fact that this had been done for at least one year before. Upon receiving these the insurer, through its surplus lines agent, knew the insured had received written notice from the broker that the insurance had been placed. This evidence, to the eye of the insured, authorized the assumption that the broker had been entrusted with delivery of the contract and was authorized to receive payment of premium. If plaintiff did not intend this belief to prevail, it was free to correct the record. Had it done so, defendant would have had no reason to make payments as it did and the loss would probably have been avoided. The necessary legal implication of plaintiff's silence is that it held out the broker as its agent, a product of sound policy considerations which lie at the heart of § 6.2(a). Spilka v. South America Managers, Inc., supra, 54 N.J. at 463.
It further appears that on principles of equitable estoppel, enumerated infra, plaintiff, by its silence, is now precluded from denying the broker's agency. Although most often applied in cases involving fraud, the rule is also appropriately applicable here that as between two innocent parties equity will visit the loss upon the one by whose act the injury first could have been avoided. Stone v. Limouze, 111 N.J. Eq. 421, 423 (E. & A. 1932); Zabriskie v. Mack, 132 N.J. Eq. 516, 518 (Ch. 1942); 2 Pomeroy's Equity Jurisprudence, § 363 (1941). Finally, based upon the uncontradicted facts it is concluded as a matter of law that plaintiff's *389 notification of confirmation to the broker on April 21, 1975 constituted delivery of the contract of insurance by the insurer to the broker within the meaning of § 6.2(a). The premium payments followed insured's receipt of the broker's transmission of the contract in the form of a binder, and are therefore protected by the statute.
Plaintiff's dilemma, as we have said, in contending that delivery of the policy is a necessary condition of agency arises from the fact that at no time during the four-year history of these transactions was a policy ever issued. It therefore falls back upon the secondary contention that its cover note should be treated as the contemplated "contract of insurance," and that no delivery could occur until this was issued. It is argued that since none was sent to the broker until June 25, 1975  after payment of premium  the statute should not apply. But this argument overlooks N.J.S.A. 17:22-6.50 which provides:
Upon placing a surplus lines coverage, the surplus lines agent shall promptly issue and deliver to the insured evidence of the insurance consisting either of the policy as issued by the insurer or, if such policy is not then available, a certificate, cover note, or other confirmation of insurance.
Nowhere in the evidence does any reason appear which would excuse plaintiff's failure to comply with the statute's requirement that the cover note be issued "promptly." By April 21 plaintiff knew that the coverage had been placed by its London correspondent and had all the information essential to prepare this document. That it had been advised only of a provisional premium for the coverage formed no impediment to preparing a cover note since the one furnished on June 25 was itself based on the provisional premium.
If issuance of the cover note was to be a vital prerequisite to creation of the agency, it was required to be issued promptly and to the insured. Plaintiff's own tardiness in this respect will not be used to defeat the overriding legislative purpose of safeguarding premium payments made by *390 an insured to its broker in reliance upon the broker's apparent authority to receive them. Instead, we will regard plaintiff as having depended upon the broker's timely "binder" of April 21 as its chosen form of compliance with the option offered by the statute that it promptly issue "other confirmation of insurance." It was this document, and not the cover note, which marked the point in time after which premium payments to the broker were received on behalf of the insurer.
The court has examined Seabrook Farms, Inc. v. Commercial Ins. Co., 104 N.J. Super. 419 (Ch. Div. 1969), and Lezak v. National Grange Mutual Ins. Co., 233 N.Y.S.2d 607 (Sup. Ct. 1962), and finds both inapplicable. While these opinions reject the presumption of agency, their factual bases lack elements strongly in evidence here. In Seabrook Farms, for example, the broker received the premiums even before establishing any contact whatever with the insurer. And in Lezak, although the insured had bought two previous policies through the broker from the same insurer, at the time he paid the premiums for the third policy the insurer had not yet furnished the broker with any indication that it would issue the policy and there was a complete lack of any apparent authority demonstrated by the broker.
Plaintiff's further argument is that N.J.S.A. 17:22-6.2a and the common law policy which it codifies does not, in any event, apply to the transaction of surplus lines insurance. In this case, it is urged, the question of whether the insurer has been paid must be determined exclusively by the prescription of N.J.S.A. 17:22-6.54, enacted in 1960 as part of the New Jersey Surplus Lines Law. It provides:
If the unauthorized insurer has assumed the risk as to a surplus lines coverage placed under this surplus lines law, and if the premium therefor has been received by the surplus lines agent who placed such insurance, then in all questions thereafter arising under the coverage as between the insurer and the insured the insurer shall be deemed to have received the premium due to it for such coverage; and the insurer shall be liable to the insured as to losses covered by such insurance and for unearned premiums which may become *391 payable to the insured upon cancellation of such insurance, whether or not in fact the surplus lines agent is indebted to the insurer with respect to such insurance or for any other cause.
The point made here is that although the surplus lines insurer, here Lloyds, may have assumed the risk of coverage, since the requirement that payment be received by the surplus lines agent has not been satisfied, the presumption of receipt by the insurer is not authorized. This contention must be assessed against the following sponsor's statement annexed to the bill at the time of its enactment:
It is declared that the purposes of the surplus lines law are to provide orderly access for the insuring public of New Jersey to insurers not authorized to transact insurance in this State, through only qualified, licensed, and supervised surplus lines agents resident in New Jersey, for insurance coverages and to the extent thereof not procurable from authorized insurers; to regulate and supervise the placement of such coverages so as to provide the maximum protection for the insuring public of New Jersey; to protect such authorized insurers, which under the laws of New Jersey must meet certain standards as to policy forms and rates, from unwarranted competition by unauthorized insurers who, in the absence of this law, would not be subject to similar requirements; and for other purposes as set forth in this surplus lines law.
By providing that payment of premium to a surplus lines agent settles any later question of payment as between insurer and insured the Legislature is not understood to bar the presumption arising from payment to a broker who has been held out as the insurer's agent. The results intended by the two statutes are by no means mutually exclusive. Each was designed to advance the interests of consumer protection within their separate spheres of concern, a view which is reinforced by the later passage of the more comprehensive § 6.2a in 1966. The Legislature is presumed to be thoroughly conversant with its own legislation. Brewer v. Porch, 53 N.J. 167, 174 (1969). It is further presumed to have passed or preserved cognate laws, with the intention that they be construed to serve a useful and consistent purpose. Thus, it is the duty of the courts to reconcile them so *392 as to give effect to both expressions of the lawmakers' will. State v. Federanko, 26 N.J. 119, 130 (1958). The conclusion here is inescapable that the Legislature realized that its more recent enactment, referring to "any" insurer and "any" insurance broker, would encompass not only authorized, but surplus lines carriers as well. There is little logic to be found in a statutory program which would relieve the insured from tracing premium payments from a broker-agent to an authorized insurer, but impose the requirement that such payments be traced to a surplus lines agent in cases involving an unauthorized insurer. Compare Spilka v. South America Managers, Inc., supra, 54 N.J. at 463-464.
Spilka, it should be noted, also involved payments by an insured to his broker which were never received by the surplus lines agent or the surplus lines insurer. The court there applied the case law codified by § 6.2(a), with the result that the insurer was nevertheless deemed to have received the premiums. However, whether § 6.54 was the exclusive standard in cases involving surplus lines insurance had not been presented for consideration and the decision is therefore not regarded as controlling authority upon this question.
In any case, the circumstances are such as to require that plaintiff be equitably estopped from confining defendant's claim of payment to the limits prescribed by § 6.54. We have already noted the mandate of § 6.50 that the surplus lines agent "promptly issue and deliver to the insured" (emphasis supplied) evidence of the insurance. At no time during the conduct of their relationship did plaintiff either issue its cover notes "promptly" or, at any point in time, deliver them "to the insured." Throughout the four years during which these policies (referred to by plaintiff's vice-president as "renewals") were being placed by plaintiff, all the material papers were being received by defendant from its broker, Donnelly Bros. Bills were sent by plaintiff to the broker who, in turn, prepared its own bill for submission to defendant. Since nothing was sent from plaintiff to defendant, it is impossible to understand how defendant should know that its premium *393 payments must find their way to the surplus lines agent. As we have found, plaintiff should have known that defendant was justifiably acting upon the belief that the broker was authorized to receive payments. Nevertheless, plaintiff withheld any measures to correct what it now describes as defendant's misapprehension.
The components of an equitable estoppel are well known. As catalogued by the court in Feldman v. Urban Commercial, Inc., 70 N.J. Super. 463 (Ch. Div. 1961), they consist of the following:
(1) there must be conduct  acts, language, or silence  amounting to a representation or a concealment of material facts; (2) these facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it; (6) he must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party's being permitted to repudiate his conduct and assert rights inconsistent with it. [at 474]
See also, Clark v. Judge, 84 N.J. Super. 35, 54 (Ch. Div. 1964), aff'd 44 N.J. 550 (1965).
No doubt exists as to the applicability of these principles to the facts considered.
There being no genuine issue as to any material fact challenged, it clearly appears that defendant is entitled to declaratory judgment as a matter of law that Donnelly Bros. was authorized to receive on behalf of the insurer all insurance premiums paid by defendant for coverage with Lloyds of London and Companies which became effective April 25, 1975.
*394 Counsel for defendant is requested to submit an order for judgment providing for the denial of plaintiff's motion and granting defendant's.