261 N.J. Super. 139 (1992)
618 A.2d 352
PAUL RUGALA, ANNA RUGALA AND ANTHONY J. POLAKAS, PLAINTIFFS,
v.
NEW JERSEY INSURANCE UNDERWRITING ASSOCIATION, DEFENDANT-RESPONDENT, AND NATIONAL ASSOCIATES, DEFENDANT-APPELLANT, AND J. RICHARD FERRY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1991.
Decided January 17, 1992.
*140 Before Judges KING, DREIER and BROCHIN.
Lars S. Hyberg argued the cause for appellant, National Associates (McAllister, Westmoreland, Vesper & Schwartz, attorneys; Lars S. Hyberg, on the brief).
Thomas A. Shovlin argued the cause for respondent, New Jersey Insurance Underwriting Association (Riley, Di Camillo & Shovlin, attorneys; Thomas A. Shovlin, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
*141 Pursuant to statute, defendant New Jersey Insurance Underwriting Association, whose membership consists of insurance companies writing property insurance in New Jersey, provides basic fire insurance and extended coverage for insurable property in this State whose owners are unable to obtain property insurance from the usual commercial sources. N.J.S.A. 17:37A-1 et seq.; see Needham v. N.J. Ins. Underwriting, 230 N.J. Super. 358, 365, 553 A.2d 821 (App.Div. 1989). Plaintiffs Paul Rugala, Anna Rugala, and Anthony J. Polakas own a frame building in Vineland, New Jersey. From August 27, 1987 through August 27, 1988, their property was insured against fire and other perils under a policy issued by the Association. Defendant National Associates is the insurance broker that procured that insurance.
On June 30, 1988, the Association and National both notified the property owners by mail that their policy would expire on August 28, 1988. National reminded them again several times by telephone. The property owners submitted the renewal application and a check for their renewal premium to National on Friday, August 26, 1988.
That same day, National endorsed the property owners' premium check and mailed it to the Association, by regular mail, for a renewal policy to become effective on Saturday, August 27, 1988. At approximately 4 a.m. on Sunday, August 28, 1988, the property owners' building was destroyed by fire. Their check for the renewal premium arrived in the Association's office on Monday, August 29, 1988.
The property owners demanded reimbursement for their loss in accordance with the terms of their renewal policy. The Association refused payment, claiming that when the fire occurred, the original policy had already expired and the renewal policy had not yet become effective because the premium not been received.
*142 The property owners sued the Association and National. National crossclaimed against the Association, claiming that as a broker, it was entitled to indemnification from the Association as a matter of contract and of decisional law. All of the parties moved for summary judgment. On the basis of N.J.S.A. 17:37A-8, the New Jersey Insurance Underwriting Association's plan of operation, and Millner v. New Jersey Ins. Underwriting Ass'n, 193 N.J. Super. 653, 475 A.2d 653 (App.Div. 1984), the Law Division judge entered judgment in favor of the Association, dismissing both the property owners' complaint and National's crossclaim.
Only National has appealed from the dismissal of its crossclaim against the Association.
National contends that, pursuant to N.J.S.A. 17:22-6.2a, it accepted the renewal premium in advance of the fire as the Association's agent and that the property was therefore insured against the fire damage under the renewal policy. It asserts that the regulations on which the court and the Association rely, contained in the Association's plan of operation, are applicable only to the original issuance, and not to the renewal of an insurance policy. It argues that Millner is distinguishable on its facts or, if it is indistinguishable, that we should recognize that Millner was wrongly decided and refuse to follow it. Alternatively, National asserts that summary judgment should have been denied because discovery had not yet been completed.
For the following reasons, we disagree with National and therefore affirm.
N.J.S.A. 17:22-6.2a, upon which National relies for its claim that it received the renewal premium before the fire as the Association's agent, reads in part as follows:
Any insurer which delivers in this State to any insurance broker a contract of insurance ... pursuant to the application or request of such broker... shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery....
*143 As Judge Antell explained in Global American Ins. Managers v. Perera Co., Inc., 137 N.J. Super. 377, 385-386, 349 A.2d 108 (Ch.Div. 1975), aff'd o.b. 144 N.J. Super. 24, 364 A.2d 546 (App. Div. 1976), that statute codifies the common law principle, accepted in New Jersey and rooted in considerations of apparent authority, that "where the broker has been entrusted to deliver the policy, the insured may justifiably believe that his broker is authorized to receive payment of premium therefor on the insurer's behalf." (Emphasis added.)
N.J.S.A. 17:37A-7 directs the New Jersey Insurance Underwriting Association to adopt a "plan of operation.... [which] shall provide for economical, fair and non-discriminatory administration, and for the prompt and efficient provision of essential property insurance to promote orderly community development." N.J.S.A. 17:37A-7. The provisions of the plan which has been adopted in accordance with that statute affect the significance of N.J.S.A. 17:22-6.2a for the present case. That plan of operation, part of which is referred to as the FAIR Plan in the Association's manual, states:
3. Authority of Agents and Brokers (Producers)
The FAIR Plan has no agents. The use of the term "Agent" does not grant any contract relationship, either actual or implied, between the FAIR Plan and any individual or entity.
1. No agent or broker has or shall have any authority to bind the Plan in any way.
2. No agent or broker may issue a policy, binder, endorsement or cancellation notice, nor assign any loss, on behalf of the Plan. No agent or broker may sign any form as an authorized representative of the FAIR Plan.
3. When dealing with the FAIR Plan, any licensed property insurance agent or broker is acting as the designated representative of the applicant or insured, and not as an agent of the Plan.
Because of these terms of the Association's plan of operation, National knows, or ought to know, that it is not an agent for the Association. Unlike an insured, National cannot fairly claim the benefit of the statutory agency by estoppel embodied in N.J.S.A. 17:22-6.2a. That act, like the doctrine of apparent agency which it codifies, protects members of the public who rely on the appearance of agency with which insurers *144 cloak brokers by authorizing them to deliver contracts of insurance. See Kubeck v. Concord Ins. Co., 103 N.J. Super. 525, 248 A.2d 131 (Ch.Div. 1968), aff'd o.b., 107 N.J. Super. 510, 533, 259 A.2d 473 (App.Div. 1969). National is not an insured and, assuming it could do so, is not suing in the right of an insured, but solely in its own right as a broker. Because National does not come within the purpose of the statute, it is not entitled to its benefit. See Belfer v. Borrella, 9 N.J. Super. 287, 293, 76 A.2d 25 (App.Div. 1950); State v. Machuzak, 227 N.J. Super. 279, 282-83, 546 A.2d 1099 (Law Div. 1988).
Furthermore, even where N.J.S.A. 17:22-6.2a is invoked on behalf of an insured, it confers apparent agency only on a broker to whom "[a]ny insurer ... delivers in this State ... a contract of insurance ... pursuant to the application or request of such broker...." In the present case, no "contract of insurance" was, or could be, delivered prior to the fire loss because National transmitted the property owners' check and application by regular mail and, according to the Association's plan of operation "if applicant utilizes regular mail service, not Certified Mail, the coverages requested by such application(s) shall be bound at 12:01 a.m., standard time, on the date application is received in the Association office...." That date was Monday, August 29, 1989, the day after the fire.
National argues that N.J.S.A. 17:37A-8(b)(3) supports its contention that the provisions of the Association's plan of operation which establish when coverage becomes effective should be interpreted as inapplicable to renewal policies. For that proposition, National relies on the following sentence from that statutory section:
Any policy issued pursuant to the provisions of this section shall be renewed annually, upon application therefor, so long as the information contained in the original application remains valid.
We do not agree that this language supports National's contention. This sentence establishes the conditions for coverage. It does not determine when coverage commences.
*145 The plan provisions for determining the effective date of coverage clearly imply that they are intended to apply to applications for renewals as well as to applications for initial coverage. The plan states:
All policies expire at 12:01 a.m. on the Expiration Date shown on the Declarations. Insurance coverage will cease at that time and will not automatically be renewed or continued. An "Application for Continuation of Insurance ..." form ... signed by the insured, must be submitted for continuation of expiring insurance. To assist in the processing of such requests submit applications in quadruplicate to Association at least 45 days prior to expiration.
The same rules for determining the effective date of insurance coverage are applicable to applications both for initial policies and for renewals because the Association has chosen to deal with both types in the same way. In both instances, binders may be issued before eligibility for insurance is verified; if the Association subsequently determines that the risk does not meet its underwriting standards, the insurance will be rescinded.
According to the Association's plan of operation, if National had mailed the application and premium check to the Association by certified mail on the same date that it actually mailed them by regular mail, the property owners would have been insured prior to their fire loss. Summarized in tabular form, the relevant provisions of the plan are as follows:

 Mode of Transmission Effective Date of Coverage
U.S. Postal Service  Certified 12:01 a.m., standard time, on
Mail, affixing a postage the next day following the
stamp to the transmittal envelope cancellation date shown on
(not meter postage) the transmittal envelope
Regular mail service, not 12:01 a.m., standard time, on
Certified Mail the date application is received
 in the Association office
Hand delivery to the Association 12:01 a.m., standard time, on
office the day after the application
 is received in the Association
 office

*146 National contends that making the effective date of coverage depend on whether the application and premium check were sent certified or regular mail is arbitrary and unreasonable.[1]
We disagree. Dating the inception of coverage of insurance from 12:01 a.m. of the day following mailing when the application is transmitted by certified mail and from 12:01 a.m. of the day of actual receipt when it is transmitted by regular mail is not arbitrary or unreasonable. The obvious purpose of the distinction is to guard against the fraudulent submission of a back-dated application after a casualty loss has already been sustained. Certified mail enables the sender to obtain proof of the date of mailing. Ordinary mail does not. To avoid fraud, it is reasonable to provide that insurance coverage shall commence at 12:01 a.m. on the day following mailing only when proof of the date of mailing is available, and that otherwise coverage shall commence on the date following actual receipt.
By its plan of operation, the Association has undertaken to insure any risk submitted to it as eligible, even before the application for insurance has been reviewed. The Association is satisfied to protect itself against the possibility that the risk submitted will fail to meet its underwriting standards by reserving the right to rescind. But the plan of operation also *147 makes clear that the Association is unwilling to assume the risk that an application has been submitted only after a loss has been suffered, or that the evidence of the date of application will be too ambiguous to enable the Association to readily determine whether a property owner decided to buy insurance only after a loss. That policy decision is for the Association to make, and National has not demonstrated that the choice is unreasonable. Cf. Barone v. Dep't. of Human Serv. Div. of Med. Asst., 210 N.J. Super. 276, 285-86, 509 A.2d 786 (1986), aff'd, 107 N.J. 355, 526 A.2d 1055 (1987).
We therefore sustain the validity of the Association's rule that coverage will be bound before receipt of the requisite premium and application only when they are mailed by certified mail with documentary evidence supplied by the post office showing the date of mailing. In our view, that is a reasonable and valid rule of general application, and it governs the present case even though, in this instance, there is no claim of fraud. Our ruling is consistent with Millner v. N.J. Ins. Underwriting Association, 193 N.J. Super. 653, 475 A.2d 653 (App.Div. 1984), and we therefore have no reason to question the holding in that case.
We also reject National's argument that summary judgment was premature because discovery had not yet been completed. The material facts are not in genuine dispute. National speculates that further discovery may disclose that the property owners' application reached the Association's offices before the fire occurred early Sunday, August 28, 1988. However, in its brief and answers to interrogatories National has repeatedly conceded that the Association received the application on Monday, August 29. The concession was clearly not improvident because a letter mailed in Cape May near the close of business on Friday, August 26 would not have been delivered to the Association's office in Newark before Monday morning, August 29.
The judgment appealed from is affirmed.
*148 DREIER, J.A.D. (dissenting).
I take issue on three narrow grounds with the result reached by my colleagues. While I realize that the problem was accentuated by the insured's eleventh-hour payment and the agent's failure to use certified mail, I fail to see what purpose is served by visiting the loss upon the agent rather than upon the insurer.
There is no question in this case that the insured made payment to the agent prior to the expiration of the policy; that the agent forwarded the payment to the insurer prior to the expiration of the policy; and that the loss occurred on the first day of what was clearly intended to be a renewal term for which the insured had paid the insurer.
According to the majority's analysis, had the payment been mailed a week in advance during the Christmas season and the letter had been delivered a day after the fire, or if the payment were mailed a month in advance and the post office lost the letter, there similarly would be no coverage. It is true that the agent could have avoided the problem by using certified mail, but I question whether this error should impose the cost of the fire loss upon the agent, where all parties acknowledge that the payment actually had been mailed prior to the expiration of the policy and therefore prior to the fire. The majority agrees that the purpose of the Commissioner's "plan of operation" was to shield the Association from fraudulent claims, either on the part of an insured or an agent. That purpose is not furthered by the decision in this case, where such fraud is neither asserted nor in any way implicated by the facts.
In Millner v. New Jersey Ins. Underwriting Ass'n, 193 N.J. Super. 653, 475 A.2d 653 (App.Div. 1984), we mistakenly stated that before a renewal policy could issue "approval by the Association was required." Id. at 657, 475 A.2d 653. This approval is in fact automatic, unless it is shown that the information contained in the original application is no longer valid. To my mind, plaintiff was entitled to renewal. The *149 imposition of the certified mail requirement upon the agent where the time of mailing is not disputed is an invalid limitation upon this right of renewal. Certified mail is nothing more than conclusive proof that the mailing was accomplished at a particular time. The Association's acceptance of the representations (perhaps based upon a postmark or the fact of receipt early Monday morning) should be received as similar proof of such timely mailing. See Evid.R. 3.
The second basis for imposing liability is the fact that the agent, having paid plaintiff's claim, has the right to be subrogated to the rights of the insured. While such a subrogation right might be lost if the agent was guilty of some wrongdoing, I doubt if a court would hold that the failure to use certified mail rose to such cause for disqualification. The agent's failure to use certified mail in no way contributed to the Association's loss (if there is to be such a loss). As the failure produced no damages to the Association, it could not be grounds for a negligence claim by the Association. The agent should therefore be entitled to stand in the shoes of this insured, who had paid the premium within time to effect renewal coverage, and who had no notice of any "plan of operation" of the Commissioner.
Third, I have misgivings concerning the enforceability of the "plan of operation" adopted by the Association and the Commissioner pursuant to N.J.S.A. 17:37A-7. This plan, which provides uniform standards for the Association's dealing with insurance agents and brokers, is in effect an administrative regulation, since it was required to be "approved or promulgated by the Commissioner pursuant to the provision of [N.J.S.A. 17-37A-1 et seq.]." N.J.S.A. 17:37A-2(d).
The plan apparently was put into effect by the Association after such approval by the Commissioner, but without the notice and opportunity for comment required by the Administrative Procedure Act, N.J.S.A. 52:14B-4. The Act, with certain listed exceptions not here pertinent, defines an "administrative *150 rule" or "rule" as an "agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2(e). Although this issue was left open in New Jersey Ins. Underwriting Ass'n v. Clifford, 112 N.J. Super. 195, 204-206, 270 A.2d 723 (App.Div. 1970), we should face it here. As stated by the Supreme Court in Metromedia, Inc. v. Director Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984):
It has been consistently recognized that the widespread, continuing, and prospective effect of an agency pronouncement is the hallmark of an "administrative rule...."
An agency determination that is intended to be applied as a general standard and with widespread coverage and continuing effect can also be considered as an administrative rule if it is not otherwise expressly authorized by or obviously inferable from the specific language of the enabling statute.
Id. at 329, 478 A.2d 742. The Court in Metromedia, Inc. established a multi-factor test when the relevant features of administrative rules are present. Id. at 331-332, 478 A.2d 742. These tests are to be applied in determining whether a particular action of an agency is rule-making or adjudicative.
In this case, there is no claim that the promulgation of the "plan of operation" was in any manner adjudicative. The plan of operation to be submitted for the Commissioner's "review and approval" was required to contain "time limits and procedures for processing application." N.J.S.A. 17:37A-7a. But nowhere were the details determined by the statute. Since the mailing rules of the plan fit within the definition of rule-making, the Administrative Procedure Act procedures were not followed, and the provisions of the plan here under scrutiny are not contained in the statute, I would find this aspect of the "plan of operation" to be unenforceable.
Were this a case where the agent had been guilty of pocketing the premium or even withholding it for a substantial period to the detriment of the Association and the insured, I would have no hesitancy to join my colleagues in denying recovery. Here, however, the agent received the premium and immediately *151 forwarded it to the insurer. It seems eminently fairer for the insurer, which was paid for this coverage, to bear the loss, rather than the agent or its carrier. In effect, the Association has received what I perceive is an unwarranted windfall.
I respectfully dissent.
NOTES
[1] Our dissenting colleague would hold that this aspect of the Association's plan of operation is a rule promulgated by an administrative agency and is therefore unenforceable because it was not promulgated in accordance with the requirements of the administrative procedure act. See N.J.S.A. 52:14B-4. We disagree. The dissent notes that the plan of operation was apparently adopted by the Association with the approval of the Commissioner of Insurance. The Association is not a state agency within the meaning of N.J.S.A. 52:14B-2. The procedure which it utilized for the adoption of its plan of operation does not have to conform with N.J.S.A. 52:14B-2.

Furthermore, this argument advanced by the dissent was not raised by either of the parties. It was not argued or briefed. The Attorney General was not notified that the "validity of a rule [or] regulation... of this State is questioned in any action in which the State or an agency or officer thereof is not a party...." R. 4:28-4a. Cf. R. 2:5-1(h). Under these circumstances, we should not even consider the possible invalidity of the Association's plan of operation on the ground suggested by the dissent.