845 A.2d 619 (2004)
368 N.J. Super. 71
John W. HARDWICKE, Jr. and Terri S. Hardwicke, Plaintiffs-Appellants,
v.
AMERICAN BOYCHOIR SCHOOL, Defendant-Respondent, and
Donald Hanson, Richard Brenner, Thomas Conlin, Donald Profitt, David Schuster, J. Bruce Mellinger, Howard A. Jewell, Harold Jones and The Cook identified as "Ed" or "John," Defendants.
Douglas Palmatier, Plaintiff-Appellant,
v.
American Boychoir School, Defendant-Respondent, and
Donald Hanson, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 2003.
Decided March 26, 2004.
*621 Lawrence Lessig of the Illinois Bar, admitted pro hac vice, argued the cause for appellants (Piper Rudnick, attorneys; Robert A. Assuncao, Edison, and Keith E. Smith, of counsel and on the brief).
Wilentz Goldman & Spitzer, attorneys for appellant Douglas Palmatier, join in and rely upon the brief of appellants Hardwicke.
Jay H. Greenblatt, Vineland, argued the cause for respondent (Greenblatt & Laube and Destribats Campbell DeSantis & Magee, attorneys; Mr. Greenblatt, on the brief).
Before Judges STERN, PAYNE and LANDAU.
*620 The judgment of the court was announced in an opinion by PAYNE, J.A.D.
In a recent opinion in Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003), an action against a public elementary school principal and his employer, the Elmwood Park Board of Education, for damages sustained by minors as the result of the principal's sexual abuse, the Supreme Court affirmed the entry by the trial court of a directed verdict against the school board, finding that the evidence at trial incontrovertibly demonstrated a breach of the duty of care that the Board owed to the school's students. The Court prefaced its legal analysis with the following statement of legal principles:
The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours. While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable *622 dangers, whether those dangers arise from the careless acts or intentional transgressions of others. Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children. With those fundamental principles in mind, we address plaintiffs' claims.
[Id. at 268, 827 A.2d 1040.]
In Frugis, plaintiffs' claims were premised on theories of intentional tort, negligence, vicarious liability, negligent hiring, negligent supervision, and civil rights violations under 42 U.S.C. § 1983. They were not asserted under New Jersey's Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, and because a public school board and its employee were the defendants, the case did not raise issues of charitable immunity. See N.J.S.A. 2A:53A-7.
In the present cases, like Frugis, plaintiffs John W. Hardwicke, Jr. and Douglas Palmatier have alleged that they were the victims of sexual abuse by school employees. However, unlike Frugis, these plaintiffs were boarding students at a non-profit institution organized for educational purposes, the Columbus Boychoir School (now, the American Boychoir School, as we shall refer to it), and the relevant defendant for purposes of this appeal is their school, not a local school board. Moreover, in pursuing their claims against the school, plaintiffs have asserted causes of action under the New Jersey Child Sexual Abuse Act, as well as common-law causes of action similar to those in Frugis.
Following motions by the school for summary judgment, the trial court dismissed plaintiffs' claims asserted against it under the Child Sexual Abuse Act, determining that the school was not a "person" to which the Act applied. The court additionally dismissed plaintiffs' common-law claims against the school as barred by the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11. Finally, the court dismissed a claim by plaintiff Hardwicke against the school arising out of abuse occurring there during the summer after Hardwicke had withdrawn as a student, holding that if the abusive conduct were within the scope of the perpetrator's employment, it was barred by charitable immunity and if it were outside the scope of his employment, the school could not be held liable for the conduct on a theory of vicarious liability.
In a consolidated interlocutory appeal, which we agreed to hear by leave granted, plaintiffs challenge the court's rulings as lacking statutory and decisional support. Further, they argue as a constitutional matter that, particularly in light of the principles recognized in Frugis, a case decided after the trial court rendered its opinions, the construction accorded the statutes by the trial court operates to deny them equal protection under the law.[1]
We have been informed that, since the time of oral argument, a settlement has been reached between Douglas Palmatier and the American Boychoir School. As a result, his appeal is dismissed. However, we retain some background references to his action, since that action was also the subject of the opinions and orders of the trial court from which these appeals have been taken.
*623 A central issue in the appeal by the remaining appellant, Hardwicke, is whether the result in this factually similar case should be different from that in Frugis (assuming plaintiff's claims against his school are evidentially supported), just because he sued the school, not the school's board, and because the school that plaintiff attended was private and non-profit. Because, in the main, we find no principled distinction between the two cases, we reverse.

I.
We derive the facts of this matter from documents constituting the record on appeal. For purposes of the motions in the trial court and on appeal, they have been deemed admitted by the school. We construe them in a light most favorable to plaintiff Hardwicke, giving him the benefit of all inferences that the facts support. Baird v. American Medical Optics, 155 N.J. 54, 58, 713 A.2d 1019 (1998).
The American Boychoir School, founded in 1937, was in the late 1960s and 1970s a very small private school of approximately fifty male students located in a fifty-room Princeton mansion. In addition to its academic programs, it offered vocal and other musical training to boys in grades five through eight. Its touring choir, comprised of school students, was then and remains well known both nationally and internationally. In addition to providing a source of acclaim, the choir constitutes a major funding resource for the institution. During the period of plaintiff's attendance, the choir's director, known by the title of Music Director, functioned virtually as the alter ego of the school, performing a wide variety of key administrative and educational functions, as well as wholly controlling the school's musical program and associated tours.
In 1968, the employment of a prior Music Director of the school was terminated after it was learned that he had engaged in a "love affair" with a male student. He was replaced in 1970 at the behest of a wealthy benefactor by defendant Donald Hanson. It has been alleged that the benefactor was a pedophile, and that the benefactor was instrumental in causing a number of employees with similar interests, including Hanson, to be employed in the relevant period by the school.
As a condition of Hanson's employment, he was required to live in the main, mansion building of the school and to be present there all night throughout the week and on weekends. Various apartments in the same area in which the boys were housed were supplied by the school for Hanson's use. During a part of his tenure, Hanson lived on the third floor of the mansion in proximity to the single rooms of two specially chosen students, upon whom he and others particularly preyed. In addition, other school employees accused of engaging in sexual relations with the school's students were housed in the building. Plaintiff claims that, at the time, sex abuse was "institutionalized." If the accounts provided by him and others are accurate, it was at very least high-level and pervasive, including conduct not only by the school's Music Director but also its Headmaster and various others.
Approximately one year before Hanson was hired, in September 1969, plaintiff Hardwicke was enrolled in the seventh grade at the school as a twelve-year-old boarding student. He remained there until approximately April 1971, when he was allegedly asked to leave because his voice had changed. From October 1970 to his departure from the school in the spring of 1971, and then again during a period of two weeks in the summer of 1971, Hardwicke was subject to sexual abuse, principally *624 by Hanson. At the time that the abuse commenced, Hardwicke was just barely sexually mature, and he had little knowledge or understanding of his developing adolescent sexuality. Hanson recognized and took advantage of Hardwicke's condition, performing on him and inducing Hardwicke to perform virtually every sexual act that could conceivably have been accomplished between two males, and creating in Hardwicke's mind the unwarranted conviction that he was homosexual. As Hardwicke expressed it in a televised interview conducted in 2002, a transcript of which is included in the record, "he had me absolutely convinced that this was something I shouldn't tell, that it wasthat it was something I wanted to do."
The abuse was repetitive, often occurring more than once per day in Hanson's room and in various other public and private locations throughout the institution. Additional, but far less frequent, abuse of Hardwicke by the Headmaster, a proctor, the school's cook, and one or more friends of Hanson also took place.
It is Hardwicke's position that the abuse was known to the school, or if it were not, it should have been. This position is based upon claims that the school was aware of the sexual abuse of students by school employees prior to the time that Hanson was hired; Hanson's homosexuality was known to some when hiring occurred; while employed, Hanson maintained a homosexual relationship with a senior staff member; the abuse perpetrated upon students by Hanson was open, frequent and prolonged; abuse was perpetrated as well by a significant number of employees other than Hanson; and the school was sufficiently small that the abuse could not have continued unnoticed.
Not unexpectedly, Hardwicke claims to have sustained severe emotional and physical injuries as well as other damages as the result of the conduct that took place during his formative early adolescent years. However, he claims that he was not aware until, at the earliest, the fall of 1999 that his serious psychological illness and other injuries were caused by that abuse.
Douglas Palmatier, who entered the school at the age of nine, alleged similar abuse, exclusively at the hands of Hanson, occurring during the period of his enrollment from 1971 to 1977, along with similar emotional and other injuries and damages.
According to televised statements and reports by school students, the existence of sexual abuse by Hanson and others at the school and on tour has been described by "at least a dozen" young student victims attending the school during the 1970s. One has described a night when the students were roused from bed and paddled by the Headmaster for engaging in sex with Hanson. However, no discipline was meted out to Hanson at the time and no information regarding the cause for student discipline was given to a parent who promptly and angrily responded to his son's report of the paddling episode.
The school disclosed in answers to supplemental interrogatories that in early November 1981, eleven years after the abuse by Hanson had begun, the parents of a student informed a school board member of sexual contact by Hanson with their son. A special meeting of the school's board was convened, and it was determined that Hanson should move off campus, his contact with students should be restricted, and he should be closely monitored while the matter was investigated. During the investigation, another parent came forward with similar allegations. Although Hanson eventually admitted sexual contact with the second child, he was not immediately terminated. According to the school's interrogatory answers,
*625 The Board determined that given the School's finances the continued existence of the School would be called into serious question should the Choir's major tour of the year, scheduled for February and March, be cancelled due to the firing of Donald Hanson as Music Director, with attendant loss of income.
Finding that the school's students were well protected by the procedures put in place immediately following the initial disclosure, the board continued Hanson's employment until March 1982 when his resignation was accepted, and he was relieved of his duties effective either on March 30, 1982 or in June of that year.
On March 28, 1982, the school sent a letter to all parents, signed by board member Stephen N. Howard, in which Howard announced that it was his "very sad duty" to report the resignation of Hanson "for reasons of personal health." The letter did not mention Hanson's by then admitted sexual misconduct, but stated instead:
Donald's contributions to the School over the years have been monumental. In fact, as many parents are aware, he alone held the School together during the early seventies: acting as executive director as well as music director, hiring and firing staff, running the admissions and concert offices, from time to time driving the bus and occasionally even washing the dishesand all the while by slow degrees rebuilding a choir that soon became recognized internationally as we know it today. His story at the Boychoir School is one of total devotion to the boys and dedication to the best interests of the School. He held the School together while the Board of Trustees rediscovered its own mission, and he deserves our heartfelt thanks for all he has done.
The parents of the two students whose complaints led to Hanson's termination chose to keep their accusations confidential. Hanson moved to Canada, where he remains.
Between 1982 and 1999, two additional students came forward with allegations against school employees. One wrote to the school in 1982 or 1984 to describe sex abuse by a proctor, but received no response. The other filed suit, and in 1986 reportedly received a settlement of approximately $875,000.
In 1999, Hardwicke verbally disclosed the sexually abusive conduct of the school's employees to American Boychoir School President, John Ellis. Although the school did not follow up directly with Hardwicke, in April 2000 it disclosed in a letter addressed to its alumni that it had dismissed a "senior staff member" in 1982 after allegations of inappropriate sexual contact had been made by two students. The letter continued by stating that, since 1982, two additional students had reported similar contact, and it acknowledged the call by Hardwicke. The letter stated that the conduct had been reported recently to the New Jersey Division of Youth and Family Services, which had chosen not to pursue the matter, and that to "help us develop an appropriate response," the school had engaged "outside consultants" including "mental health professionals and attorneys with extensive experience in working with victims of abuse." Calls from those alumni with information or concerns regarding inappropriate behavior were encouraged. In deposition testimony, a former student stated that he had been told by Ellis that he had received "many, many difficult phone calls" following the 2000 letter.

II.
*626 On January 31, 2001,[2] a complaint was filed on behalf of John Hardwicke, Jr. and his wife, Terri Hardwicke, against Hansen and the American Boychoir School. In that complaint, plaintiff John Hardwick sought compensatory and punitive damages on the following theories: sexual abuse in violation of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1 (Count I); intentional infliction of emotional distress (Count II); negligent infliction of emotional distress (Count III); breach of a duty to disclose the misconduct of Hanson to students and active concealment of that misconduct (Count IV); assault and battery (Count V); negligent hiring and supervision (Count VI); and false imprisonment (Count VII). A claim for loss of consortium was asserted on behalf of Terri Hardwicke in Count VIII.[3] In an amended complaint filed on October 21, 2002, school officials Richard Brenner, Thomas Conlin, Donald Profitt, David Schuster, J. Bruce Mellinger, Howard A. Jewell, Harold Jones,[4] and the school's cook, identified as "Ed" or "John," were added as named defendants. The defense of charitable immunity was first pled in answer to the Hardwickes' amended complaint.
A complaint styled as a class action asserting the same causes of action against Donald Hanson and the American Boychoir School as those raised by John Hardwicke was filed on behalf of Douglas Palmatier in 2002. Hanson was served with the Hardwicke complaint in Canada, and he has defaulted.
Subsequently, various motions for summary judgment were brought on behalf of the American Boychoir School. In an opinion filed on June 14, 2002 in the Hardwicke matter, the trial court addressed the applicability of the Child Sexual Abuse Act to claims against the school. There, the court held that the school met some of the Act's foundational requirements for applicability by constituting Hardwicke's household and standing in an in loco parentis relationship to him. However, the court also held that, because the school was not a "person" subject to the Act's provisions, the Act was not applicable to it.
Further, the court held that Hardwicke's common-law claims against the school did not trigger the Act's extended accrual features set forth in N.J.S.A. 2A:61B-1b. This was so, the court held, because liability under the Act on the part of the school for the underlying conduct was nonexistent. "It would make no sense" the court held, for the Legislature to craft a statutory remedy that excluded the school, while permitting plaintiffs asserting common-law claims against the school to rely on the Act's relaxed statute of limitations provisions. However, the court declined to find plaintiff's common-law claims untimely as a matter of law. Accordingly, in an accompanying order, the court dismissed Hardwicke's statutory claims contained in Count I of his complaint against the school and denied summary judgment on the remaining claims pending a hearing pursuant to the discovery rule principles set forth in Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973).
*627 Count IV of the complaint, which was not a subject of the school's motion, was not addressed by the court. The court's decision on the inapplicability of the Child Sexual Abuse Act was later extended to the Palmatier matter.
In a second opinion entered in both the Hardwicke and Palmatier cases on January 6, 2003, the trial court addressed the school's motion for summary judgment based upon the school's alleged immunity from suit as a non-profit educational institution and the absence of any vicarious liability for the intentional torts of Hanson and other employees. In that opinion, the court rejected Hardwicke's argument that the school had waived a charitable immunity defense by failing to raise it in answer to his initial complaint or in the sixteen months prior to the school's answer to his amended complaint.
Further, the court found charitable immunity to apply to the school, and it found that the use of statutory charitable immunity did not violate the plaintiffs' right of access to the courts protected under the Petition clause of the First Amendment, either the Due Process or the Equal Protection clauses of the Fourteenth Amendment of the Federal constitution, or applicable provisions of the State's constitution.
As a final matter, the court addressed the school's arguments with respect to vicarious liability for acts by Hanson. It found that in light of its ruling on charitable immunity, it need not address issues concerning the school's liability while Hardwicke and Palmatier were present as students. In connection with Hardwicke's claims arising out of conduct occurring in the summer of 1971, the court found, as we have previously stated, that if Hardwicke were present solely as a guest of Hanson, then vicarious liability could not be imposed upon the school because Hanson's acts occurred outside the scope of his employment. Alternatively, if the acts were within Hanson's employment, then the school was immune from liability on charitable immunity grounds.
The court therefore entered orders granting summary judgment to the American Boychoir School on all remaining counts of the Hardwicke and Palmatier complaints, ruling that their actions could proceed only against the individually named defendants.

III.
We commence our analysis of Hardwicke's arguments on appeal with the issue of the applicability of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, enacted in 1992. That statute was drafted principally in response to an invitation for reform contained in an article discussing our decision in Jones v. Jones, 242 N.J.Super. 195, 576 A.2d 316 (App.Div.), certif. denied, 122 N.J. 418, 585 A.2d 412 (1990). See Michael J. Pimpinelli, Incest: The Secret Tort, 127 N.J.L.J. 116-17 (Jan. 17, 1991). See also Ronald J. Fleury, In Trenton, the Subject was Torts: Pending Senate Bill Fosters Incest Victims' Right to Sue, 129 N.J.L.J. 1, 28-29 (Sept. 5, 1991) (describing legislative history). Jones, an action by a victim of childhood incest, highlighted the difficulties encountered by incest victims in framing their causes of action against the abuser and complicit individuals under traditional tort theories and in obtaining a tolling of the statute of limitations in order to successfully institute actions for damages arising from long-past abuse. See Brian D. Gallagher, Note, Damages, Duress, and the Discovery Rule: The Statutory Right of Recovery for Victims of Childhood Sexual Abuse, 17 Seton Hall Legis. J. 505, 519-21 (1993).
The Act establishes a specific statutory cause of action for child sexual abuse (see *628 Senate Judiciary Committee Statement, Senate, No. 257L.1992, c. 109), which is defined in N.J.S.A. 2A:61B-1a(1) in a manner that clearly encompasses the sexually abusive conduct by the school's employees that has been alleged in this case. In language crucial to this appeal, the statute also defines as sexual abuse conduct by "[a] parent, foster parent, guardian or other person standing in loco parentis within the household who knowingly permits or acquiesces in sexual abuse by any other person...." Ibid. However, the statute provides that it is an affirmative defense to this secondary liability[5] "if the parent, foster parent, guardian or other person standing in loco parentis was subjected to, or placed in, reasonable fear of physical or sexual abuse by the other person so as to undermine the person's ability to protect the child." Ibid.
The statute further provides in paragraphs b and c for an extended statute of limitations applicable to actions based on sexual abuse, stating:
b. In any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse. Any such action shall be brought within two years after reasonable discovery.
c. Nothing in this act is intended to preclude the court from finding that the statute of limitations was tolled in a case because of the plaintiff's mental state, duress by the defendant, or any other equitable grounds. Such a finding shall be made after a plenary hearing....
The Act contains rape-shield[6] and confidentiality provisions, N.J.S.A. 2A:61B-1d to -1g, and in paragraph h, authorizes damages "in the amount of $10,000, plus reasonable attorney's fees, or actual damages, whichever is greater." Compensatory damages including but not limited to pain and suffering, medical expense, emotional trauma, diminished childhood and enjoyment of life, costs of counseling, and lost wages, as well as punitive damages, are recognized as recoverable. Ibid.
The Act applies to the present matter by its terms, which provide that it "shall not apply to any action which is commenced before the effective date." Historical and Statutory Note on N.J.S.A. 2A:61B-1 (1992). See also J.L. v. J.F., 317 N.J.Super. 418, 429, 722 A.2d 558 (App.Div.) (holding that the Act applies prospectively to complaints filed after its effective date), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999).
We hold that the Child Sexual Abuse Act reaches farther than did the trial court and encompasses the conduct alleged on the part of the school. At the outset, we agree with the trial judge that the school operated in an in loco parentis capacity with respect to its students. In a section captioned "In Loco Parentis" in its Houseparent Handbook, 2000-2001, included in the record, the school admits to its role as a substitute parent for the students. A similar admission of the relationship was made by the current President of the American Boychoir School, who stated in a televised interview that he was the person who sits in loco parentis. See N.J.R.E. 803(b)(4) (hearsay exception for agency admissions); N.J.R.E. 803(c)(25) (admissions against interest); Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455, *629 461-62, 720 A.2d 601 (1998) (statement by corporate personnel director to employee regarding reasons for termination admissible as party admission). Further, that relationship has been acknowledged by the Supreme Court in an equivalent setting in the passage from Frugis with which we commenced this opinion. Frugis, supra, 177 N.J. at 268, 827 A.2d 1040. Other case support exists as well. See, e.g., Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 654, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564, 575 (1995) ("When parents place minor children in private schools for their education, the teachers and administrators of those schools stand in loco parentis over the children entrusted to them."); Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3165, 92 L. Ed.2d 549, 559 (1986).
Moreover, we agree with the trial court that there is little doubt that, in the context of a boarding school, the school effectively acted as the "household" within which the abusive conduct occurred. The school acted in a parental capacity to the students within its care, providing for them necessary shelter, food, education, recreation, and succor. Its control over and duty of care for the students housed within its confines did not markedly differ from that assumed by parents. See Dale v. Boy Scouts of Am., 160 N.J. 562, 602, 734 A.2d 1196 (1999), rev'd on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L. Ed.2d 554 (2000). Compare Smith v. Estate of Kelly, 343 N.J.Super. 480, 502, 778 A.2d 1162 (App.Div.2001) (holding that the Catholic Church was not "within" a parishioner's household). In a very real sense, the school and its students formed a community (albeit of unrelated individuals) to which the term household can aptly be applied in this context.
New Jersey has long given an expansive and flexible definition to the term household. See Gibson v. Callaghan, 158 N.J. 662, 677, 730 A.2d 1278 (1999) (declining to adopt a restrictive dictionary definition of household); Mazzilli v. Accident & Cas. Ins. Co., 35 N.J. 1, 8, 170 A.2d 800 (1961) ("Household is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits."); Miller v. United States Fidelity & Guar. Co., 127 N.J.Super. 37, 41, 316 A.2d 51 (App.Div.1974) (the meaning of "resident in your household" may vary with circumstances). It does no violence to that term to apply it here. See Global Am. Ins. v. Perera Co., 137 N.J.Super. 377, 386, 349 A.2d 108 (Ch.Div.1975), aff'd, 144 N.J.Super. 24, 364 A.2d 546 (App.Div. 1976) (remedial statutes are to be interpreted liberally, and their terms are to be given the most extensive meaning to which they are reasonably susceptible).
Where we depart from the reasoning of the trial judge is in his conclusion that a corporate entity such as a school is not encompassed among those who could be charged with child sexual abuse under the secondary liability provisions of the Child Sexual Abuse Act, and that those chargeable under the Act are limited to natural persons. In reaching our divergent conclusion, we have looked principally to the purpose of the statute, which was to articulate a statutory cause of action for child sexual abuse and to formulate a tolling provision that would address statute of limitations issues arising as the result of the delayed filing of claims. The statute as enacted establishes liability not only on the part of the individual abuser, but also on the part of "a parent, foster parent, guardian or other person" standing in loco parentis within the household "who knowingly permits or acquiesces in sexual abuse by any other person." Nothing in the statute's legislative history suggests a limitation on those to be held liable to natural *630 persons. At most, the statute is silent on this point.
Because, as we have noted, the statute had its origins in Jones v. Jones, a case involving abuse by a father, in which the mother allegedly acquiesced, we can assume that the Legislature's focus was in fact on natural persons as those most likely to be in a position to commit the type of secondary abuse that the statute prohibited. However, we can not ascribe any intent on the part of the Legislature to specifically exclude corporate "persons" from the statute's reach, should circumstance such as those allegedly present at the American Boychoir School be found to actually exist. See N.J.S.A. 1:1-2, which provides:
Unless it be otherwise expressly provided or there is something in the subject or context repugnant to such construction, the following words and phrases, when used in any statute and in the Revised Statutes, shall have the meaning herein given to them.
Person. The word "person" includes corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals, unless restricted by the context to an individual as distinguished from a corporate entity....
See also N.J.S.A. 1:1-1 (general rules of construction); Morgan v. Air Brook Limousine, Inc. 211 N.J.Super. 84, 92, 510 A.2d 1197 (Law Div.1986) (construing the term "person" in the New Jersey Consumer Fraud Act to apply to a franchisor that was not a natural person). In light of the statute's purpose, we are reluctant to artificially restrict its reach without at least some indication, not present here, that such a restriction was intended. Global Am. Ins., supra, 137 N.J.Super. at 386, 349 A.2d 108.
Indeed, to do so would create the anomaly that exists in this case in its present posture. Hanson can be sued, but he has left the country, has defaulted, and doubtlessly has few assets. The Board of Trustees could have been sued, as was the analogous Board of Education in Frugis. However, in Frugis, the conduct at issue had recently occurred, and the Board was basically extant. Here, the Board as it existed in the late 1960s and 1970s has long since dispersed, and it is likely that some of its members are deceased. That leaves the school, the liability of which is derivative of the conduct of the school's board and its senior administrators and staff. But the trial court's narrow construction of the governing statute has effectively precluded suit against it. We find no warrant for that result.
The trial court justified its determination that "other person" did not include the American Boychoir School by arguing that "parents," "foster parents" and "guardians" were all natural persons and that as the result of the operation of ejusdem generis, an "other person" must be a natural person as well. The court also justified its determination by noting that the defense to secondary liability of duress could only be invoked by natural persons, and by arguing that a corporation could not engage in "knowing" conduct, as the statute requires.
We do not find these arguments to be persuasive. We note that in New Jersey, the Division of Youth and Family Services, a governmental entity, often serves as a guardian. Thus, the terms preceding "other person" do not exclusively encompass natural persons so that ejusdem generis would naturally restrict the meaning of "other person." Moreover, we have little doubt that a maxim can be found to meet any difficulty in statutory construction, and that the maxim chosen dictates *631 the result achieved. However, we are concerned in this particular case that an unswerving, mechanistic application of such rules of construction will inflict obvious harm, without materially advancing the statute's primary objective: to provide civil redress for injuries inflicted on children through sexual abuse. Cf. Jones, supra, 242 N.J.Super. at 203, 576 A.2d 316 (rejecting the mechanistic application of statutes of limitation).
We note additionally that any liability of the school must be derived from the conduct of natural persons. Thus, the inclusion of an incorporated entity among those to be held liable is in no sense discongruent. Further, it is the "knowing" conduct of those natural persons from which corporate liability is derived. Thus, the fact that a corporation has no scienter, per se, is immaterial. See, e.g., N.J.S.A. 2C:2-7 (imposing criminal liability on corporations for conduct of their agents within the scope of employment) and 1971 Commentary ("In New Jersey today, it would appear that there are virtually no crimes, including those requiring a criminal intent or a corrupt motive, of which a corporation may not be guilty.").
Finally, we recognize that the affirmative defense to liability arising if the "parent, foster parent, guardian or other person" was "subjected to, or placed in, reasonable fear of physical or sexual abuse" by the actual abuser "so as to undermine the person's ability to protect the child" can apply only to natural persons. However, we have been offered no legal precedent that would support the position that the scope of those entitled to exercise an affirmative defense defines the scope of those subject to liability.
Accordingly, we find no impediment to the inclusion of the American Boychoir School as a "person" encompassed within the strictures of N.J.S.A. 2A:61B-1, and we reverse the trial court's contrary conclusion.

IV.
Because the trial court had dismissed claims against the school arising out conduct subject to N.J.S.A. 2A:60B-1 in its order of June 14, 2002, it did not address in its subsequent opinion discussing the effect of charitable immunity[7] the relationship between the Child Sexual Abuse Act and the Charitable Immunity Act, N.J.S.A. 2A:53A-7 and -7.1. Having found a cause of action to have been stated under the Child Sexual Abuse Act, we must reach this issue.
In oral argument of this appeal, counsel for plaintiffs argued forcefully that the statutory cause of action created by N.J.S.A. 2A:61B-1 was not subject to the bar of charitable immunity. We agree.
In doing so, we once again look to Frugis. In that case, the Supreme Court articulated as "fundamental principles," in the context of the liability of a school board, that board's "heightened duty," beyond even education, "to do no harm to the children in its care" and to ensure that teachers and administrators educate, not endanger, and protect, not exploit, vulnerable children. Frugis, supra, 177 N.J. at *632 268, 827 A.2d 1040 (expressing fundamental principles) and 282-83 (articulating heightened duty and jury instructions setting forth that duty). Although the Child Sexual Abuse Act was not invoked in Frugis, we find the principles embodied in the secondary liability provisions of that Act to coincide with those articulated in that case. In the context of this case, it is a child's right to bodily integrity, and the school's obligation to safeguard that right, that are at stake.
We look as well to J.S. v. R.T.H., 155 N.J. 330, 714 A.2d 924 (1998), in which the Supreme Court held that a spouse who has actual knowledge or reason to know of the sexual abuse perpetrated on minors by her husband is under a duty to take steps to protect or warn of the harm, the breach of which constitutes a proximate cause of any resulting damages. There, the Court, citing our earlier opinion in the case, recognized that: "`There can be no doubt about the strong policy of this State to protect children from sexual abuse and to require reporting of suspected child abuse.'" J.S., supra, 155 N.J. at 343, 714 A.2d 924 (1998) (quoting id., 301 N.J.Super. 150, 156, 693 A.2d 1191 (App.Div.1997)).
With these principles in mind, we perceive serious constitutional concerns to arise under the due process and equal protection concepts expressed in this State's constitution under N.J. Const. art. I, ¶ 1 if secondary liability under the Child Sexual Abuse Act is construed to be subject to the bar of charitable immunity.[8] Under the balancing test required in the circumstances, the strong public and social policy concerns underlying statutes and cases addressing child sexual abuse, most recently expressed in Frugis, no doubt outweigh any policy favoring the preservation of a responsible charity's fiscal well-being: a primary statutory goal of the Charitable Immunity Act.[9]See Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985); Right to Choose v. Byrne 91 N.J. 287, 309-10, 450 A.2d 925 (1982). A *633 child's fundamental right to bodily integrity cannot be found secondary to a charity's well-being.
The concept of waiver has also been advanced to support the statute's distinction for purposes of recovery between beneficiaries, who are barred, and non-beneficiaries, who are not. See O'Connell v. State, 171 N.J. 484, 496-97, 795 A.2d 857 (2002). We do not understand the waiver concept to include waiver by a student of his school's liability on account of child sexual abuse, and we deem any waiver by the parents to be ineffective.
We do not accept the school's position, contained in its post-argument briefing, that Frugis supports the constitutionality of the application of the Charitable Immunity Act to a charitable organization accused of abuse under the Child Sexual Abuse Act. An issue in Frugis was whether liability for sexual misconduct should be apportioned between the Board of Education and the school principal pursuant to applicable provisions of the Tort Claims Act. N.J.S.A. 59:9-3.1. The plaintiff took the position that apportionment in this context, resulting in the allocation of a large portion of the liability to the principal, would violate his right to a thorough and efficient education under N.J. Const. art. VIII, § 4, ¶ 1, since by diminishing the Board's monetary exposure, the Board's duty of care would be equivalently diminished. Frugis, supra, 177 N.J. at 274, 827 A.2d 1040. Because the Court rejected this constitutional challenge in a sexual abuse context, the American Boychoir School argues on appeal here, the Court would similarly reject a constitutional challenge on equal protection and due process grounds to the invocation of the Charitable Immunity Act to bar the school's statutory liability for sexual abuse.
In Frugis, the Court determined that allocation was statutorily required under N.J.S.A. 59:9-3.1. However, the Court resolved the constitutional problem that had been raised by offering "guidelines [in the form of `powerful' jury instructions] for assessing the relative degrees of fault between a negligent school board and an abusive school official to minimize the likelihood of diluting the board's responsibility to protect its students from foreseeable dangers, including those presented by staff members." Id. at 274-75, 827 A.2d 1040. In light of those instructions, the Court held: "we do not find persuasive plaintiff's argument that the Appellate Division's construction of N.J.S.A. 59:9-3.1 violates the Thorough and Efficient Education Clause of our State Constitution." Id. at 283, 827 A.2d 1040. In Frugis, therefore, the Court did not find that constitutional concerns were absent. It merely found that they could be addressed by a charge that virtually insured a finding of substantial liability on the part of the school board.
In the present case, the Charitable Immunity Act, unlike the Tort Claims Act, need not be read so as to insulate the school from substantial liability, since the Act does not address liability premised on either a statutory violation requiring knowing conduct or a common law violation involving intentional or other non-negligent conduct. As a consequence, the constitutional concerns that were always recognized in Frugis (albeit arising from a different constitutional provision) can be more directly addressed as a matter of statutory interpretation.
We are mindful of the dictate that statutes are to be construed in such a fashion as to avoid a determination of unconstitutionality. Frugis, supra, 177 N.J. at 283, 827 A.2d 1040. See also In re Commitment of W.Z., 173 N.J. 109, 126, 801 A.2d 205 (2002), in which the Court prefaced its statutory analysis by stating:

*634 We begin our analysis with "the assumption that the Legislature intended to act in a constitutional manner." Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982). Our jurisprudence applies a form of "constitutional doubt" doctrine. State v. Johnson, 166 N.J. 523, 540, 766 A.2d 1126 (2001). In construing a challenged statute, courts will "seek to avoid a statutory interpretation that might give rise to serious constitutional questions." Silverman v. Berkson, 141 N.J. 412, 417, 661 A.2d 1266 (1995).
[Ibid.]
We thus construe the Charitable Immunity Act as inapplicable to "persons," including the American Boychoir School, whose liability is premised upon the secondary liability provisions of the Child Sexual Abuse Act. This construction is supported by the fact that the Charitable Immunity Act, by its terms, provides insulation only from liability as the result of "damage from ... negligence"a common-law theory of liability. It does not address the statutory cause of action set forth in Count I of plaintiff's complaint, a cause of action arising as the result of legislative fiat, not the development of the common law. Further, the Charitable Immunity Act was enacted long before the new cause of action set forth in the Child Sexual Abuse Act was recognized. It therefore could not have been contemplated by the Legislature when charitable immunity was first legislatively recognized. Moreover, the amendment to the statute occurring in 1995, after the enactment of the Child Sexual Abuse Act, does not expand the scope of charitable immunity to include statutory causes of action. See Township of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 279, 486 A.2d 818, cert. denied sub nom Borough of Demarest v. Mahwah Tp., 471 U.S. 1136, 105 S.Ct. 2677, 86 L. Ed.2d 696 (1985) (stating that the Legislature is presumed to be aware of legislation existing at the time that a statute is enacted).
We also note that secondary liability under the Child Sexual Abuse Act requires "knowing" conduct. The Charitable Immunity Act does not provide protection to corporations from conduct at that level of scienter. Under the plain language of the statute, insulation from liability arising as the result of a statutory cause of action requiring knowing conduct is not addressed. As the Court stated in O'Connell, supra, 171 N.J. at 488, 795 A.2d 857, in determining that state colleges may invoke charitable immunity as a defense to actions alleging negligent conduct:
"`In the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent.' " Young v. Schering Corp., 141 N.J. 16, 25, 660 A.2d 1153 (1995) (quoting Roig v. Kelsey, 135 N.J. 500, 515, 641 A.2d 248 (1994)). As a general rule, that process begins with an examination of the plain language of the statute. Hubbard v. Reed, 168 N.J. 387, 392, 774 A.2d 495 (2001); State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). Where a statute is clear and unambiguous on its face and admits of only one interpretation, a court must infer the Legislature's intent from the statute's plain meaning. V.C. v. M.J.B., 163 N.J. 200, 217, 748 A.2d 539, cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000); Franklin Tower One v. N.M., 157 N.J. 602, 613, 725 A.2d 1104 (1999). A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language. State v. Afanador, 134 N.J. 162, 631 A.2d 946 (1993); State v. Wright, 107 N.J. 488, 495, 527 A.2d 379 (1987). "[W]e need delve no deeper *635 than the act's literal terms to divine the Legislature's intent." Butler, supra, 89 N.J. at 226, 445 A.2d 399.
[Ibid.]
As a consequence, we find charitable immunity to be unavailable to the American Boychoir School as a defense to Count I of plaintiff's complaint. Although the Legislature has directed that the Charitable Immunity Act be construed liberally, N.J.S.A. 2A:53A-10, we are nonetheless bound by the plain language of N.J.S.A. 2A:53A-7 and constrained by the spectre of unconstitutionality were we to interpret this statute so as to wholly insulate the American Boychoir School from liability under the Child Sexual Abuse Act. Were we to find other than we have, New Jersey could become, in the words of warning expressed by plaintiffs' counsel, a haven for sex abuse by charitable institutions acting within the State.

V.
A further issue exists as to whether plaintiff's common-law causes of action against the school for intentional and negligent infliction of emotional distress, breach of a duty to disclose Hanson's misconduct to students and active concealment of that misconduct, assault and battery, negligent hiring and supervision, and false imprisonment are, in the context of this case, barred by charitable immunity. An argument can be made that the common-law causes of action asserted by plaintiff are subsumed within the statutory cause of action set forth in Count I of his complaint. To that extent, none is barred by charitable immunity for the reasons that we have previously set forth. The following analysis addresses only the continued viability, in light of charitable immunity, of those common-law causes of action that plaintiff seeks to assert independently from his claim under the Child Sexual Abuse Act.
The Charitable Immunity Act provides:
No nonprofit corporation ... organized exclusively for ... educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation ... provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation....
[N.J.S.A. 2A:53A-7a.]
Paragraph c of that statute, adopted in 1995 as part of an extension of the statute's protections from just eleemosynary institutions to their trustees, directors, officers, employees, agents, servants or volunteers, provides an exception to immunity for any such person "causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature." N.J.S.A. 2A:53A-7c.
Hardwicke argues first that the defense of charitable immunity was waived as the result of the failure by counsel for the American Boychoir School to plead it in answer to his initial complaint, and by the school's failure to raise the defense for a period of sixteen months until its answer to plaintiff's amended complaint was filed. We agree with the analysis of the trial judge, by which he found that no waiver had occurred. The court observed, and we concur, that "it surely would have been preferable for the School's counsel to raise *636 their client's potentially-dispositive immunity at the outset of the litigation." Indeed, Rule 4:5-4 requires that "a responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense." However, as the trial court noted, that rule of pleading has not been treated as an absolute mandate. Exceptions have been made when public policy demands it, and there is no unfair surprise, substantial prejudice, or undue interference with the administration of justice. Rivera v. Gerner, 89 N.J. 526, 536, 446 A.2d 508 (1982). The case before us, we hold, fits well within this exception, since the defense could not be deemed unanticipated and it was asserted long prior to the completion of discovery or the assignment of a trial date. Moreover, to find waiver in Hardwicke would (absent Palmatier's settlement) create a divergence in treatment between that case and Palmatier's that cannot be justified on any principled basis. We decline to recognize the means to such an anomalous result.
Plaintiff argues next that the plain language of the statute demonstrates that it only provides immunity for negligence. Thus, plaintiff appears to concede that his causes of action sounding in negligence, insofar as they are asserted independently from causes of action under the Child Sexual Abuse Act, are barred by charitable immunity.
In barring all of the common-law causes of action asserted by plaintiffs Hardwicke and Palmatier against the school on charitable immunity grounds, the trial court conceded that the statute relating to the liability of non-profit charitable corporations spoke only of damages from negligence. The court further found that the amendments to the statute in 1995 to provide charitable immunity to the agents, servants and employees of charitable corporations and to exempt from immunity conduct by them that constituted "willful, wanton or grossly negligent act[s] of commission or omission, including sexual assault and other crimes of a sexual nature" demonstrated that the Legislature "knew how to express itself concerning conduct more severe than negligence."
However, the trial court rejected plaintiffs' argument that, as a result of the language that we have quoted, charitable corporations could be held immune from liability only for underlying conduct that was negligent. It held that the "long-established judicial gloss" on the statute demonstrated the intent to preserve immunity even if the underlying conduct upon which liability was premised constituted an intentional tort. In support of this position, the trial court cited Schultz v. Roman Catholic Archdiocese, 95 N.J. 530, 532, 472 A.2d 531 (1984) and our decision in S.P. v. Collier High School, 319 N.J.Super. 452, 469-70, 725 A.2d 1142 (App.Div.1999), as well as a number of unreported decisions.
On appeal, plaintiff urges us to disregard this precedent, arguing that "no amount of judicial gloss should overcome the plain language of a statute, nor the presumption that legislators are capable of distinguishing between ordinary negligence and the vast array of conduct qualifying as tortious." We find, instead, that the precedent can be rationalized with the result that plaintiff espouses.
In Schultz, a case concerning the liability of the Roman Catholic Archdiocese of Newark for sexual abuse of a student by an employee at a school and at a summer Boy Scout camp, the Court held that the Archdiocese was immune from liability premised on a theory of negligent hiring. Thus, the Court's determination did not in any fashion extend the scope of the Charitable Immunity Act beyond acts based upon negligence.
*637 The Court did discuss in dictum the dissent's view that the intentional nature of the underlying conduct removed the entire incident from the Charitable Immunity Act's protections. The majority rejected that view, finding that, ordinarily, employers are not held liable for the intentional acts of employees, since they fall outside the scope of employment. If the dissent's position were adopted, the Court reasoned, "[t]hat would make the church, protected in the past by the common law immunity and now by statutory immunity, more vulnerable than private entities protected by neither common law nor statutory immunity." Schultz, supra, 95 N.J. at 535, 472 A.2d 531. But see Frugis, supra, 177 N.J. at 268-74, 827 A.2d 1040 (holding a Board of Education independently liable, despite the intentional nature of the conduct of its employee, a school principal); Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 615-24, 626 A.2d 445 (1993) (establishing that an employer can, under agency and direct liability principles, be held liable for conduct that is outside the scope of employment).
However, the Court did not rule that the Archdiocese would be immune if its own conduct[10] were intentional. Indeed, the Court specifically left open the issue of "[w]hether immunity should cloak those with a reckless or gross disregard for the safety of others." Id. at 539, 626 A.2d 445.
Following Schultz, in Monaghan v. Holy Trinity Church, 275 N.J.Super. 594, 646 A.2d 1130 (App.Div.1994), we held that acts of gross negligence attributable to a church were immunized from liability by the Charitable Immunity Act.
In S.P., vicarious liability on the part of a private school was alleged to exist as the result of the "fraud, misrepresentation, recklessness and gross negligence" of the school's principal in failing to adequately address a student's complaints of sexual abuse by a fellow student. We affirmed an order of summary judgment in favor of the school, entered on charitable immunity grounds. In doing so, we concurred with the motion judge that there were "no proofs of willful or wanton conduct or gross negligence" by the school's principal on the record produced. S.P., supra, 319 N.J.Super. at 469, 725 A.2d 1142. As a consequence, charitable immunity was premised as a factual matter only upon the principal's allegedly negligent conduct. Thus, our holding in S.P. does not extend immunity to types of conduct other than negligence.
We then stated in dictum that "the 1995 amendments to N.J.S.A. 2A:53A-7 granting employees and agents immunity, but excepting from that immunity liability for `a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature,' suggest the immunity for the charitable or non-profit organization itself is not lost." Ibid. Equally compelling arguments can be made that the Legislature simply did not consider the extent of corporate immunity when defining the scope of immunity to be newly conferred on individual agents, servants and employees of a corporation, or that the Legislature found that the restriction of immunity on the part of corporations to actions based *638 upon negligence was sufficiently clear as to require no amendatory language. A further argument can be made that, whereas acts of negligence and gross negligence attributable to a corporation are immunized, acts constituting willful and wanton misconduct as well as intentional misconduct, which differ in kind from degrees of negligence, are not.
In any case, no reported decision, including Schultz and S.P., has held that a charitable institution is immune from suit by its beneficiaries when that suit is based on the institution's own intentional conduct or intentional conduct attributed to it through agency doctrine: conduct requiring a different degree of scienter from that based upon negligence concepts. See G.S. v. Department of Human Servs., 157 N.J. 161, 177-80, 723 A.2d 612 (1999) (defining wanton and willful misconduct and distinguishing it from intentional misconduct). Cf. Laidlow v. Hariton Mach. Co., 170 N.J. 602, 617, 790 A.2d 884 (2002) (discussing the intentional wrong exception to the workers' compensation bar on tort actions). We see nothing in the language of N.J.S.A. 2A:53A-7a, even when viewed in light of N.J.S.A. 2A:53A-7c, to suggest that we should further expand the Act's protections to include such conduct. Section 7c certainly does not require it, since it does not make reference to intentional acts, nor does section 7a.
As a consequence, we find charitable immunity to be inapplicable to direct claims of intentional conduct by or attributed to[11] the American Boychoir School arising out of sexual abuse, insofar as those claims are independent from those asserted under the Child Sexual Abuse Act. Whether such claims can be factually supported is not before us.

VI.
Plaintiff appeals as well from the court's dismissal of his claims of sexual abuse by Hanson arising during the summer of 1971, either as barred by the Charitable Immunity Act or as outside the scope of Hanson's employment and thus not attributable to the school on a theory of respondeat superior.
Hardwicke's claims relating to abuse by Hanson and others sustained at the American Boychoir School while he was a guest of Hanson, during a period when school was not in session but faculty and administration were present on campus, was not factually pleaded in either Hardwicke's initial or his amended complaint. The trial judge nonetheless considered them, and we find no abuse of discretion in his having done so. R. 4:9-1; Kernan v. One Washington Park, 154 N.J. 437, 456-57, 713 A.2d 411 (1998).
However, we reverse his ultimate conclusion that, as a matter of law, liability cannot be imposed on the school for conduct occurring during that period. Our discussion of principles of direct and vicarious liability applies as well to the school's liability for conduct occurring while Hardwicke was enrolled as a student.
We qualify the extent of our opinion in this regard: In his original and amended complaints, Hardwicke asserted causes of action against the school arising from alleged negligent and intentional infliction of emotional distress, failure to disclose and concealment of misconduct, assault and battery, negligent hiring and supervision, and false imprisonment. We regard these newly asserted facts as among those underlying Hardwicke's stated causes of action. However, because each cause of action is not associated in Hardwicke's complaints with particular facts, we cannot *639 determine precisely which rely on conduct of Hanson for which Hardwicke seeks to hold the school liable on a theory of respondeat superior and which rely on institutionalized practices or conduct by others in promoting, failing to discover, and/or failing to safeguard against Hanson's abuse or in committing other wrongs. For this reason, we cannot provide a specific factual context for our discussion of the liability of the school. However, we note that direct liability premised upon institutionalized practices has been recognized by the Supreme Court in Lehmann, supra, 132 N.J. at 623, 626 A.2d 445 ("Although an employer's liability for sexual harassment of which the employer knew or should have known can be seen to flow from agency law, it can also be understood as direct liability. When an employer knows or should know of the harassment and fails to take effective measure to stop it, the employer has joined with the harasser in making the working environment hostile."). As Lehmann recognizes, agency principles also supply grounds for such liability.
We first address charitable immunity. We hold for the same reasons that we have set forth in the prior section of this opinion that claims against the school arising out of intentional conduct are not barred by charitable immunity. We hold as well that factual issues have been raised as to whether Hardwicke was the school's beneficiary or not during the period in question. Thus, a determination of the applicability of the Charitable Immunity Act to Hardwicke's claims alleging conduct that is not intentional in nature cannot be made as a matter of law at this time.
Addressing vicarious liability for emotional distress, assault and battery, and false imprisonment (the claims upon which the school sought summary judgment on grounds of lack of respondeat superior liability), we hold that the fact that the underlying conduct by Hanson giving rise to liability was intentional does not necessarily absolve the school of liability for it. We distinguish Cosgrove v. Lawrence, 214 N.J.Super. 670, 520 A.2d 844 (Law Div.1986), aff'd, 215 N.J.Super. 561, 522 A.2d 483 (App.Div.1987), a case in which we held that a public entity employer could not be held vicariously liable for the acts of a defendant therapist who had repeated sexual relations with his client, because the acts occurred outside the scope of the therapist's employment. Id. 215 N.J.Super. at 562, 522 A.2d 483 (citing Restatement (Second) of Agency § 228(1)(a)). In Cosgrove, the employer's duties arose solely as the result of the employment relationship. As Frugis suggests, a school that stands in an in loco parentis relationship to a boarding student in its charge has a different relationship to the student, giving rise to a non-delegable duty to take reasonable measures to safeguard the student and ensure that its employees do not endanger or exploit the child. Frugis, supra, 177 N.J. at 268, 827 A.2d 1040.
Moreover, Cosgrove was decided prior to the Supreme Court's decision in Lehmann, in which it recognized agency principles as set forth in the Restatement (Second) of Agency § 219(2)(c) and (d) as providing a basis for respondeat superior liability. Lehmann, supra, 132 N.J. at 619-23, 626 A. 2d 445 (holding in accordance with the Restatement that a master may be subject to liability for the torts of his servants acting outside the scope of their employment if the servant's conduct violated a non-delegable duty of the master or the servant purported to act on behalf of the principal, there was reliance upon the apparent authority, or he was aided in accomplishing the tort by the existence of *640 the agency relationship). See also Entrot v. BASF Corp., 359 N.J.Super. 162, 172-73, 819 A.2d 447 (App.Div.2003). Further grounds for liability can be found in the Restatement's § 214 (providing that a master, under a non-delegable duty of care, who delegates that duty to a servant is liable for the failure of the servant to perform that duty). As a consequence, we do not agree that, as a matter of law, claims of vicarious liability by the school arising from the conduct of Hanson are barred.
We also find issues of fact to exist as to whether the conduct of other employees of the school whose liability plaintiff seeks to impute to the school acted within the scope of their employment in doing what they allegedly did. Moreover, issues of fact exist as to whether any conduct by them outside the scope of employment can be imputed to the school.

VII.
As a final matter, we address the standards to be applied on remand in determining whether any of the causes of action that remain are time barred. The Child Sexual Abuse Act provides that in "any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." N.J.S.A. 2A:61B-1b. The statute does not state: in "any civil action for injury or illness arising under this Act." We thus interpret the relaxed statute of limitations to apply to all remaining counts of plaintiff's complaint, not only those brought under the Child Sexual Abuse Act. Any other interpretation would require the application of differing standards to a single body of conduct, comprised essentially of that occurring during the time of Hardwicke's enrollment in the American Boychoir School. We see no reason for that exercise.
The Child Sexual Abuse Act also permits a tolling of the statute of limitations "because of the plaintiff's mental state, duress by the defendant, or any other equitable grounds." N.J.S.A. 2A:61B-1c. We recognize that this broad language may be construed to protect this case, or others, from the bar of the statute of limitations. We also recognize as having some merit the argument that an institution such as a school that, long ago, addressed the problems of sexual abuse and put proper controls in place should not now be called upon to pay for past transgressions. However, issues will exist as to how promptly the abuse was addressed and the controls put in place. Additional issues may arise, as here, because of allegations that the school engaged in a long-standing pattern of nondisclosure and misinformation regarding the existence of known sexual abuse. The right of compensation for injuries to persons who in their childhood years were subject to sexual abuse also must be considered. See also J.L., supra, 317 N.J.Super. at 431-36, 722 A.2d 558 (discussing the considerations relevant to a determination of statute of limitations issues in the context of the Child Sexual Abuse Act). A resolution of these issues in a particular case, requiring a balancing of the factors that we have enumerated in this opinion and in J.L., together with others that may arise out of the particular circumstances presented, is one that in the first instance must occur at the trial level. We find it inappropriate in the present context to deem one consideration more important than another, or to let that consideration guide our resolution of the case.

VIII.
The orders of summary judgment in favor of the American Boychoir School by *641 the trial court are reversed insofar as they relate to (1) the inapplicability of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, to the school; (2) the applicability of the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11, to claims under the Child Sexual Abuse Act; and (3) the applicability of the Charitable Immunity Act to plaintiff's common-law claims premised upon intentional conduct. Additionally, summary judgment is reversed on claims by Hardwicke arising out of his alleged sexual abuse during the summer of 1971. Summary judgment is affirmed on grounds of charitable immunity as to those common-law claims asserted by plaintiff that arise from negligent conduct. The matter is remanded for further proceedings in accordance with this opinion. The appeal of Douglas Palmatier is dismissed.
STERN, P.J.A.D. (concurring).
While I join Judge Payne's thoughtful opinion insofar as it expresses the law of New Jersey as it exists today, I arrive at that conclusion by a somewhat different route. My approach is premised on the belief that the Charitable Immunity Act ("CIA"), N.J.S.A. 2A:53A-7 et seq., immunizes a nonprofit educational institution from civil liability even when based on the unlawful and intentional wrongdoing of its employees and agents. I read the CIA to protect such entities from suits under both the common law and the new Sexual Abuse Act ("SAA"), N.J.S.A. 2A:61B-1.[1] However, because I join Judge Payne's analysis concerning the impact of Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003), I would also hold that the CIA can no longer bar a suit such as this one.

I.
I agree with the trial judge that, on its face, the CIA, N.J.S.A. 2A:53A-7, bars this suit against the defendant school.[2] Specifically, I adhere to S.P. v. Collier High School, 319 N.J.Super. 452, 469-70, 725 A.2d 1142 (App.Div.1999), and conclude that the CIA immunizes the school from the willful and wanton wrongdoing of a servant or employee who commits a sexual assault against a student. The 1995 amendments to the CIA make clear that the immunity exception embodied in section 7(c) applies only to individuals, not to the entity itself, and includes a specific reference to "sexual assault and other crimes of a sexual nature." Whether we like it or not, that was a legislative judgment because such acts are inherently beyond the scope of employment, and we are referred to no legislative history or case law suggesting that the 1995 statute does more than clarify prior law with respect to the charitable institution and cannot apply to a suit based on actions that occurred before its enactment. I see no basis for concluding that the 1995 statute, by providing immunity for individuals and exceptions to that immunity for willful and wanton acts, including sexual assault, changed the law as it stood with respect to the nonprofit education institution itself, since the CIA was adopted in 1958. (L.1958, c 131; L.1959, c 90). If the immunity provided for in the CIA covered only negligence, there would be no need for the exception for willful and wanton misconduct.
In any event, the 1995 amendments were enacted with the knowledge of the *642 Legislature that the SAA existed[3] and with the presumed understanding of our case law and of the disagreement about the impact of the CIA with respect to the liability of charitable entities for conduct beyond the mere negligence of employees. See Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 535-39, 472 A.2d 531 (1984) (no liability for negligent hiring of abuser); id. at 543, 472 A.2d 531 (Handler, J. dissenting); Lindroth v. Christ Hospital, 21 N.J. 588, 590-96, 123 A.2d 10 (1956); Monaghan v. Holy Trinity Church, 275 N.J.Super. 594, 600, 646 A.2d 1130 (App.Div.1994); Seiderman v. American Institute for Mental Studies, 667 F.Supp. 154, 160-61 (D.N.J.1987). Thus, as the trial judge wrote:
In Schultz v. Roman Catholic Archdiocese, supra, 95 N.J. [530,] 532, 472 A.2d 531 (1984), the Supreme Court refused to deprive the defendant church of charitable immunity, even though the underlying conduct was an intentional tort. The Court in Schultz emphasized that in Subsection 10 of the Act, the Legislature declared that the Act shall be deemed "remedial and shall be liberally construed so as to afford immunity." Id. at 537-38, 472 A.2d 531 (quoting N.J.S.A. 2A:53A-10). Given that legislative mandate of policy, the Court was unwilling to limit the Act to garden-variety negligence claims. Indeed, the Court challenged the Legislature to consider amending the statute and address whether "immunity should cloak those with a reckless or gross disregard for the safety of others." Id. at 539, 472 A.2d 531. Eleven years later, the Legislature did so by adopting subsection 7(c). But that provision only withholds immunity, in cases of willful or wanton conduct or other extreme misdeeds, from individuals, not from charitable entities.

Therefore, as the trial judge concluded, the CIA facially protects this defendant:
Of course, plaintiffs were harmed, not benefited, by any sexual abuses perpetrated upon them while they were enrolled at the School. But those tragic circumstances, even if true, do not alter the plaintiffs' beneficiary status. The law looks to whether or not the plaintiffs were "strangers" to the charitable organization, not whether they derived a benefit from the tortious conduct inflicted upon them. Bixenman v. Christ Episcopal Church Parish House, 166 N.J.Super. 148, 152-53, 399 A.2d 312 (App.Div.1979) (finding that a church-goer who fell off hazardous platform at parish house was a beneficiary under the Act, as plaintiff was present on the premises for the purpose of receiving the works of the church). Analogously, the Supreme Court in Schultz v. Roman Catholic Archdiocese of Newark, supra, 95 N.J. at 534, 472 A.2d 531, treated an eleven-year old student who was sexually abused while attending a summer camp as a beneficiary of the parish school that had sponsored the camp. The camp was run by a Franciscan brother who worked for the plaintiff's parish school. The school, in turn, was owned and controlled by the defendant Archdiocese. Id. at 532, 472 A.2d 531.
I am also inclined to agree with the trial judge's analysis concerning plaintiff's visit *643 to the school in the summer of 1971 after his enrollment had ended. It must be accepted as true, for present purposes, that while a guest in Hanson's room on school premises, Hanson had sex with plaintiff almost daily over a two-week period. But, as the trial judge stated:
Even accepting Hardwicke's factual assertions about his 1971 summer visit and his legal characterizations of those events, his claims against the defendant School are nevertheless flawed. If, on the one hand, Hanson brought Hardwicke to the School in the summer of 1971 strictly as his personal guest, then Hanson was not acting within the scope of his employment. Accord Cosgrove v. Lawrence, 214 N.J.Super. 670, 674-77, 520 A.2d 844 (Law Div.1986), aff'd, 215 N.J.Super. 561, 522 A.2d 483 (App.Div. 1987) (employer not vicariously liable for its therapist employee's sexual assault of a patient, because the act of sexual relations was outside the scope of the therapist's employment). On the other hand, if Hanson was acting within the scope of his employment by hosting plaintiff, an alumnus of the School, then plaintiff was on campus as a beneficiary of the charitable institution.
See also DiCosala v. Kay, 91 N.J. 159, 167, 173-78, 450 A.2d 508 (1982).

II.
I agree with the trial judge's analysis, which need not be developed herein, concerning the constitutionality of the CIA as of the time of his decision. The Supreme Court's subsequent opinion in Frugis clearly impacts on that analysis irrespective of whether it results in a declaration of unconstitutionality, as applied to these circumstances, or either requires or justifies an interpretation of the CIA to preserve its constitutionality. See also O'Connell v. State, 171 N.J. 484, 795 A.2d 857 (2002) (applying the CIA to a non-profit state university). I have no doubt, in light of Frugis ` holding against a local Board of Education based on the conduct of an elementary school principal, that a private not-for-profit school student, abused for the sexual gratification of a person having a role like Hanson's, may bring an action against the school, even though it is a nonprofit educational corporation. And this is so even though his or her parents decided to send the student to private school. That decision, or election, cannot be deemed to constitute a waiver or relinquishment of the student's rights to security and protection in school or to bring an action against the school for breach of that duty. Hence, the CIA can no longer immunize a nonprofit private educational institution from failing to meet its responsibility to protect a minor student from the type of conduct for which a public school board of education is now liable.
By taking my approach, we announce a "new rule of law," which impacts on the issue of retroactivity. See Henderson v. Camden Cty. Mun. Util. Auth., 176 N.J. 554, 561-63, 826 A.2d 615 (2003); Kibble v. Weeks Dredging & Constr. Co., 161 N.J. 178, 192, 735 A.2d 1142 (1999); Frazier v. New Jersey Mfrs. Ins. Co., 142 N.J. 590, 606, 667 A.2d 670 (1995); Coons v. American Honda Motor Co., Inc., 96 N.J. 419, 424-34, 476 A.2d 763 (1984), cert. denied, 469 U.S. 1123, 105 S. Ct. 808, 83 L.Ed.2d 800 (1985). However, consideration of that issue is best reserved for a case in which it must be decided, particularly because these litigants would be in any event entitled to the benefits of the rule announced in this case. See, e.g., Henderson, supra, 176 N.J. at 563, 826 A.2d 615; Kibble, supra, 161 N.J. at 196, 735 A.2d 1142; Calvert v. K. Hovnanian at Galloway, VI, Inc., 128 N.J. 37, 51, 607 A.2d 156 (1992); Devins v. Bor. of Bogota, 124 N.J. 570, 580-81, 592 A.2d 199 (1991); Kelly v. *644 Gwinnell, 96 N.J. 538, 551, 476 A.2d 1219 (1984); Merenoff v. Merenoff, 76 N.J. 535, 557-60, 388 A.2d 951 (1978). I add only that our opinion gives clear notice to charitable entities of their responsibility for conduct occurring within the institution, so that a private school cannot in the future contend, as does defendant, that it should not be responsible thirty years later for what was done by former personnel in the distant past. In my view, the approach I take considers, and is responsive to, the legitimate concerns of the dissent.

III.
I concur in the remand for a hearing regarding when the cause of action accrued, and to reconsider the applicable periods of limitation under N.J.S.A. 2A:14-2 and N.J.S.A. 2A:61B-1. See also Lopez v. Swyer, 62 N.J. 267, 275, 300 A.2d 563 (1973).[4]
LANDAU, J.A.D., (retired and temporarily assigned on recall), (dissenting).
I agree with Judge Stern's concurring opinion to the extent that it expresses his and the trial judge's views respecting the 1995 amendment to the Charitable Immunity Act and the effect that the 1995 addition of Paragraph c. to N.J.S.A. 2A:53A-7 must have upon our interpretation of legislative intent in this matter.
The concurrence would reverse, however, essentially because both of my colleagues believe that, since the Supreme Court decision in Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003), such a construction of legislative intent would deny Mr. Hardwicke equal protection of the law under the balancing tests required by the New Jersey Constitution. See Sojourner A. v. Department of Human Services, 177 N.J. 318, 332-33, 828 A.2d 306 (2003); Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985). Presumably, this concern also embraces denial of equal protection under the Federal Constitution as well.
The Frugis opinion exposed a county board of education to liability for breach of its duty to protect students from foreseeable intentional torts by school personnel. I respectfully differ with the majority's reliance upon Frugis, because it amounts to a two-step rationale for judicial circumvention of the contrary expression of legislative intent otherwise deemed clear by the trial judge and two members of this panel.
Charitable immunity has survived without constitutional nullification over the years, although it deprives victims from pursuing remedies against a qualifying entity if they are beneficiaries of the defendant charitable entity, while allowing similarly injured non-beneficiary plaintiffs to sue those entities. Frugis adds nothing new to this scene, except to create a hitherto inadequately recognized standard of duty and, consequently, a new class of potential plaintiffs. It does not, however, change the charitable immunity landscape where, as here, the Legislature and the courts have recognized the existence of a strong public policy underlying the grant of such immunity. See, e.g., O'Connell v. State, 171 N.J. 484, 499, 795 A.2d 857 (2002). Since the Legislature's immediate reaction to previous judicial efforts to abolish charitable immunity in the Collopy trilogy,[1] *645 New Jersey courts have endeavored to defer to the legislative will in such matters reasoning that it is not our province to engraft exceptions to the Charitable Immunity Act. Ibid.
In Frugis, the Court identified as "fundamental principles," the need for boards of education to take reasonable measures to ensure that children in their charge are protected from foreseeable dangers arising from careless acts or intentional transgressions and, while providing education, to do no harm to those children.
Clearly, I would not question that assessment. Neither, if the allegations are established, would I minimize the horror of the vile transgressions assertedly perpetrated upon Mr. Hardwicke thirty years ago by officials of his private boarding school. Nonetheless, we have no warrant to elevate the "fundamental principles" of duty articulated in Frugis to fundamental rights of the degree contemplated for application of strict scrutiny analysis under federal law. The multiple distinctions between public schools and privately funded, voluntarily attended, non-profit private schools support the different treatment elected by the Legislature. Absent suspect or semi-suspect classifications, not here present, it is sufficient to survive federal constitutional scrutiny if an arguable rational basis exists for New Jersey's creation of the class of protected entities recognized in N.J.S.A. 2A:53A-7, as amended. See, e.g., Greenberg v. Kimmelman, supra, 99 N.J. at 562-69, 494 A.2d 294; Nowak and Rotunda, Constitutional Law, 6th Ed., Section 14.2, 14.3 (2000).
As to the balancing test required for consideration under N.J. Const. Art. 1, ¶ 1, I cannot share the majority's conclusion of unconstitutionality arising because the public and social policy concerns expressed in Frugis "no doubt outweigh any policy favoring preservation of a responsible charity's fiscal well-being" or the distinction between beneficiaries and non-beneficiaries.
The majority has attempted to elevate the duty formulation described as in Frugis, a matter involving a negligent public board of education, to the status of newly declared fundamental rights implicating stringent constitutional protections. In so doing, the majority subjects all non-profit entities organized exclusively for religious, charitable or educational purposes, and the beneficiaries of their good works, to consequences that cannot adequately be summarized by merely referring to fiscal concerns or the implied waiver of rights by charitable beneficiaries. Those potential consequences of the majority's view are inadequately described in the principal decision's brief policy balancing exercise. They have not begun to be explored in the record before us and should not lightly be dismissed without full exploration of probable public impact of reversing the trial judge's effort to accommodate legislative intent.
Further, the evaluation under the New Jersey and Federal equal protection standards should recognize that victims of sexual abuse have not been ignored by the Legislature. Their rights have been expressly preserved against all individuals who have either committed or enabled the commission of abusive acts. N.J.S.A. 2A:53A-7c. Plaintiff's argument that an affirmance here would signal New Jersey's willingness to harbor charitably organized entities that may safely enable pedophiles to prey with impunity is answered *646 by the immunity statute itself, and by our court decisions. A non-profit entity must be organized exclusively for charitable purposes to receive benefit of immunity, N.J.S.A. 2A:53A-7, and will not receive immunity unless that is shown actually to be its dominant motive upon consideration of its operations. Bieker v. Comm. House of Moorestown, 169 N.J. 167, 171, 179, 777 A.2d 37 (2001); Parker v. St. Stephens Urb. Dev. Corp., Inc., 243 N.J.Super. 317, 327, 579 A.2d 360 (App.Div.1990).
The Legislature has mandated that the Charitable Immunity Act shall be construed liberally to afford immunity "in furtherance of the public policy for the protection of non-profit corporations, societies and associations organized for religious, charitable, educational or hospital purposes." N.J.S.A. 2A:53A-10. Since enactment of the Charitable Immunity Act in 1959, the Legislature has repeatedly revisited the Act to address specific issues. It has obviously not lost interest. Most notably for purposes of this case, the 1995 amendment limited its denial of immunity against actions arising from willful, wonton or grossly negligent acts to individual trustees, officers, agents, employees and volunteers, while carefully omitting the charitable entities from mention.
Indeed, even the Supreme Court has recently expanded, rather than contracted, the scope of charitable immunity to encompass state colleges in order to effectuate legislative intent. O'Connell, supra, 171 N.J. at 499, 795 A.2d 857.
It is also worth noting that while the principal opinion relies heavily upon the assertedly unambiguous use of the word "negligence" in N.J.S.A. 2A:53A-7, the opinion has chosen to ignore that the Frugis Court itself rejected a similar argument respecting use of the word "negligence" in the context of comparative negligence laws. Citing Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991), the Court recognized the need to accommodate legislative intent by requiring apportionment of fault for both negligent and intentional acts, despite the fact that the subject legislation only used the word "negligence." Frugis, supra, 177 N.J. at 277-78, 827 A.2d 1040.
In conclusion, absent a record adequate to balance fairly the impact of the sweeping decision made today, we should neither be announcing the adoption of "new law" nor ignoring the impact of the adoption of N.J.S.A. 2A:53A-7c in 1995.
I would affirm the order entered below and instead, invite the Legislature to hold hearings for the purpose of exploring balancing factors on the issues here addressed, and if it disagrees with such an affirmance, to appropriately modify the Charitable Immunity Act.
NOTES
[1] The Attorney General was notified pursuant to Rule 2:5-1(h) of the constitutional issues raised in this appeal. He has not participated herein.
[2] In an agreement with Hardwicke, the school waived reliance on the application of any statute of limitations accruing after January 1, 2000. Thus, January 1, 1998 becomes the legally significant date for measuring the timeliness of his suit.
[3] That per quod claim was dismissed by the trial judge on the ground that Terri Hardwicke was not married to John at the time that the abuse occurred. No appeal from that determination has been filed.
[4] The basis for these defendants' claimed liability appears to be their alleged awareness, notice and/or observation of the abuse of Hardwicke.
[5] We utilize "secondary liability" only as a shorthand to distinguish the conduct at issue from that of the person actually conducting the abuse.
[6] The provisions are similar to those in the Rape Shield Law, N.J.S.A. 2C:14-7.
[7] There appears to be no doubt that the American Boychoir School is a nonprofit corporation organized exclusively for educational purposes. See N.J.S.A. 2A:53A-7a. Further, we find that during the period of his enrollment, Hardwicke was a beneficiary of the school. O'Connell v. State, 171 N.J. 484, 491, 795 A.2d 857 (2002); Graber v. Richard Stockton College of New Jersey, 313 N.J.Super. 476, 484, 713 A.2d 503 (App.Div.), certif. denied, 156 N.J. 409, 719 A.2d 641 (1998). The fact that the school's employees may have acted unlawfully does not affect the status of the school. Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 535-36, 472 A.2d 531 (1984).
[8] Our dissenting colleague argues that charitable immunity survives federal constitutional challenge under a rational basis analysis. We question the applicability of that analysis under the Federal constitution, since the right to bodily integrity has been recognized as fundamental. See e.g., Washington v. Glucksberg, 521 U.S. 702, 720, 117S.Ct. 2258, 2267, 138 L. Ed.2d 772, 787 (1997) (due process); Seal v. Morgan, 229 F.3d 567, 574-75 (6th Cir. 2000) (equal protection). We do not agree with our colleague that the right of minors to be free from sexual attack is a newly declared one, or that it should bow to the economic concerns of charitable or educational institutions. Moreover, we note that we specifically invited the parties to address the implications of Frugis in post-argument briefs. Thus an opportunity was afforded for the delineation of those policy consequences that our colleague claims we have neglected to consider. The parties' responses did not identify or address any such consequences.
[9] Other cases holding the Charitable Immunity Act constitutional do not discuss the interaction between the Charitable Immunity Act and the Child Sexual Abuse Act. Johnson v. Mountainside Hospital, 239 N.J.Super. 312, 320, 571 A.2d 318 (App.Div.1990) (holding in a medical malpractice action, without significant discussion, that charitable immunity as applied to a hospital is constitutional under due process and equal protection analysis), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990); Edwards v. Our Lady of Lourdes Hospital, 217 N.J.Super. 448, 451, 526 A.2d 242 (App.Div.1987) (rejecting constitutional challenge to N.J.S.A. 2A:53A 8 based on limitation of damages recoverable from a hospital); Vitolo v. St. Peter's Church, 118 N.J.Super. 35, 37, 285 A.2d 570 (App.Div.) (in action for personal injuries sustained by parishioner leaving a church, the Act was held constitutional under equal protection principles), certif. denied, 60 N.J. 285, 288 A.2d 27 (1972); Makar v. St. Nicholas Ruthenian Greek Catholic Church, 78 N.J.Super. 1, 5-6, 187 A.2d 353 (App.Div.1963) (in personal injury action against church, rejecting challenge on the ground of the First Amendment's Establishment and Free Exercise Clauses).
[10] We recognize that a corporation cannot act on its own. However, it can be held liable for conduct that has been institutionalized. Lehmann, supra, 132 N.J. at 623, 626 A.2d 445. And, in circumstances defined by agency law, it can be held liable for conduct of individuals employed by the corporation. Id. at 615-24, 626 A.2d 445. We use the term "own conduct" to distinguish the cause of action from one premised upon respondeat superior liability for the conduct of the actual sexual aggressor.
[11] We discuss the nature of such conduct in the next section of this opinion.
[1] It is in this context that the trial judge also considered whether the school was a "person" under N.J.S.A. 2A:61B-1(a)(1).
[2] Given both the procedural posture of the case and the issues embodied in the grant of leave to appeal, we deal only with the defendant American Boychoir School, and not with any individual defendant. The Hardwicke complaint remains pending against the individual defendants.
[3] In other words, the 1995 amendments to the CIA did not exempt entities, such as schools, from its protection notwithstanding that their employees, such as teachers, were liable for sexual abuse under the SAA which statute was made prospective only. See N.J.S.A. 2A:61B-1 (historical note). Moreover, the 1995 amendments were enacted without adoption of the well recognized principles of vicarious liability embodied in the Restatement (Second) Agency §§ 214, 219(2)(b) and (c). See also Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 617-24, 626 A.2d 445 (1993).
[4] The Sex Abuse Act extends the two-year period "[i]n any civil action for injury or illness based on sexual abuse ... [to] the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." N.J.S.A. 2A:61B-1(b). It also contains tolling provisions in N.J.S.A. 2A:61B-1(c). See also J.L. v. J.F., 317 N.J.Super. 418, 433-35, 722 A.2d 558 (App.Div.), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999).
[1] Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 39, 141 A.2d 276 (1958); Dalton v. St. Luke's Catholic Church, 27 N.J. 22, 141 A.2d 273 (1958); Benton v. YMCA, 27 N.J. 67, 69, 141 A.2d 298 (1958).